[No. S058629. June 1, 1998.]

RUTH SHULMAN et al., Plaintiffs and Appellants, v.
GROUP W PRODUCTIONS, INC., et al., Defendants and Respondents.

206

**COUNSEL**

John D. Rowell, Lewis, Goldberg & Ball, Michael L. Goldberg, Paul & Stuart, Stuart Law Firm, Antony Stuart and William A. Daniels for Plaintiffs and Appellants.

Cornell Chulay, Epstein, Becker & Green, Janet Morgan, Terry M. Gordon, Richard A. Hoyer, Tharpe & Howell, Donald F. Austin, Davis, Wright, Tremaine, Kelli L. Sager, Karen N. Fredericksen and Frederick F. Mumm for Defendants and Respondents.

James E. Grossberg as Amicus Curiae on behalf of Defendants and Respondents.

Neville L. Johnson and David A. Elder as Amici Curiae.

## Opinion

**WERDEGAR, J.**—More than 100 years ago, Louis Brandeis and Samuel Warren complained that the press, armed with the then recent invention of "instantaneous photographs" and under the influence of new "business methods," was "overstepping in every direction the obvious bounds of propriety and of decency." (Warren & Brandeis, *The Right to Privacy* (1890) 4 Harv. L.Rev. 193, 195-196 (hereafter Brandeis).) Even more ominously, they noted the "numerous mechanical devices" that "threaten to make good the prediction that 'what is whispered in the closet shall be proclaimed from the house-tops.'" (*Id.* at p. 195.) Today, of course, the newspapers of 1890 have been joined by the electronic media; today, a vast number of books, journals, television and radio stations, cable channels and Internet content sources all compete to satisfy our thirst for knowledge and our need for news of political, economic and cultural events—as well as our love of gossip, our curiosity about the private lives of others, and "that weak side of human nature which is never wholly cast down by the misfortunes and frailties of our neighbors." (*Id.* at p. 196.) Moreover, the "devices" available for recording and transmitting what would otherwise be private have multiplied and improved in ways the 19th century could hardly imagine.

Over the same period, the United States has also seen a series of revolutions in mores and conventions that has moved, blurred and, at times, seemingly threatened to erase the line between public and private life. While even in their day Brandeis and Warren complained that "the details of sexual relations are spread broadcast in the columns of the daily papers" (Brandeis, *supra*, 4 Harv. L.Rev. at p. 196), today's public discourse is particularly notable for its detailed and graphic discussion of intimate personal and family matters—sometimes as topics of legitimate public concern, sometimes as simple titillation. More generally, the dominance of the visual image in contemporary culture and the technology that makes it possible to capture and, in an instant, universally disseminate a picture or sound allows

us, and leads us to expect, to *see* and *hear* what our great-grandparents could have known only through written description.

The sense of an ever-increasing pressure on personal privacy notwithstanding, it has long been apparent that the desire for privacy must at many points give way before our right to know, and the news media's right to investigate and relate, facts about the events and individuals of our time. Brandeis and Warren were themselves aware that recognition of the right to privacy requires a line to be drawn between properly private events, words and actions and those of "public and general interest" with which the community has a "legitimate concern." (Brandeis, *supra*, 4 Harv. L.Rev. at p. 214.) As early as 1931, in the first California case recognizing invasion of privacy as a tort, the court observed that the right of privacy "does not exist in the dissemination of news and news events." (*Melvin* v. *Reid* (1931) 112 Cal.App. 285, 290 [297 P. 91].)

Also clear is that the freedom of the press, protected by the supreme law of the First and Fourteenth Amendments to the United States Constitution, extends far beyond simple accounts of public proceedings and abstract commentary on well-known events. "The guarantees for speech and press are not the preserve of political expression or comment on public affairs, essential as those are to healthy government. One need only pick up any newspaper or magazine to comprehend the vast range of published matter which exposes persons to public view, both private citizens and public officials. Exposure of the self to others in varying degrees is a concomitant of life in a civilized community. The risk of this exposure is an essential incident of life in a society which places a primary value on freedom of speech and of press." (*Time, Inc.* v. *Hill* (1967) 385 U.S. 374, 388 [87 S.Ct. 534, 542, 17 L.Ed.2d 456].) Thus, "[t]he right to keep information private was bound to clash with the right to disseminate information to the public." (*Briscoe* v. *Reader's Digest Association, Inc.* (1971) 4 Cal.3d 529, 534 [93 Cal.Rptr. 866, 483 P.2d 34, 57 A.L.R.3d 1].)

Despite, then, the intervening social and technological changes since 1890, the fundamental *legal* problems in defining a right of privacy vis-à-vis the news media have not changed—they have, if anything, intensified. At what point does the publishing or broadcasting of otherwise private words, expressions and emotions cease to be protected by the press's constitutional and common law privilege—its right to report on matters of legitimate public interest—and become an unjustified, actionable invasion of the subject's private life? How can the courts fashion and administer meaningful rules for protecting privacy without unconstitutionally setting themselves up as censors or editors? Publication or broadcast aside, do reporters, in their

effort to *gather* the news, have any special privilege to intrude, physically or with sophisticated photographic and recording equipment, into places and conversations that would otherwise be private? Questions of this nature have concerned courts and commentators at least since Brandeis and Warren wrote their seminal article, and continue to do so to this day.[1]

In the present case, we address the balance between privacy and press freedom in the commonplace context of an automobile accident. Plaintiffs, two members of a family whose activities and position did not otherwise make them public figures, were injured when their car went off the highway, overturning and trapping them inside. A medical transport and rescue helicopter crew came to plaintiffs' assistance, accompanied on this occasion by a video camera operator employed by a television producer. The cameraman filmed plaintiffs' extrication from the car, the flight nurse and medic's efforts to give them medical care during the extrication, and their transport to the hospital in the helicopter. The flight nurse wore a small microphone that picked up her conversations with other rescue workers and with one of the plaintiffs. This videotape and sound track were edited into a segment that was broadcast, months later, on a documentary television show, *On Scene: Emergency Response*. Plaintiffs, who consented neither to the filming and recording nor to the broadcast, allege the television producers thereby intruded into a realm of personal privacy and gave unwanted publicity to private events of their lives.

The trial court granted summary judgment for the producers on the ground that the events depicted in the broadcast were newsworthy and the producers' activities were therefore protected under the First Amendment to the United States Constitution. The Court of Appeal reversed, finding triable issues of fact exist as to one plaintiff's claim for publication of private facts and legal error on the trial court's part as to both plaintiffs' intrusion claims. Agreeing with some, but not all, of the Court of Appeal's analysis, we conclude summary judgment was proper as to plaintiffs' cause of action for publication of private facts, but not as to their cause of action for intrusion.[2]

---

[1]Historical scholarship has led some writers to question whether the Boston newspapers of 1890 were in fact abusively invasive of personal privacy, or whether Brandeis and Warren's hostile attitude stemmed rather from patrician adherence to an anachronistically narrow view of what was proper "news." (See Barron, *Warren and Brandeis, The Right to Privacy, 4 Harv. L.Rev. 193 (1890): Demystifying a Landmark Citation* (1979) 13 Suffolk U. L.Rev. 875.) Whether or not Brandeis and Warren exaggerated the sensationalism and invasiveness of the newspapers of their day, however, they undoubtedly highlighted and gave vivid expression to a continuing legal problem—how to protect personal privacy without infringing on freedom of the press.

[2]Five justices (Chief Justice George, Justice Mosk, Justice Kennard, Justice Chin and myself) conclude summary judgment was proper on the cause of action for publication of

## FACTS AND PROCEDURAL HISTORY

On June 24, 1990, plaintiffs Ruth and Wayne Shulman, mother and son, were injured when the car in which they and two other family members were riding on interstate 10 in Riverside County flew off the highway and tumbled down an embankment into a drainage ditch on state-owned property, coming to rest upside down. Ruth, the most seriously injured of the two, was pinned under the car. Ruth and Wayne both had to be cut free from the vehicle by the device known as "the jaws of life."

A rescue helicopter operated by Mercy Air was dispatched to the scene. The flight nurse, who would perform the medical care at the scene and on the way to the hospital, was Laura Carnahan. Also on board were the pilot, a medic and Joel Cooke, a video camera operator employed by defendants Group W Productions, Inc., and 4MN Productions. Cooke was recording the rescue operation for later broadcast.

Cooke roamed the accident scene, videotaping the rescue. Nurse Carnahan wore a wireless microphone that picked up her conversations with both Ruth and the other rescue personnel. Cooke's tape was edited into a piece approximately nine minutes long, which, with the addition of narrative voice-over, was broadcast on September 29, 1990, as a segment of *On Scene: Emergency Response*.

The segment begins with the Mercy Air helicopter shown on its way to the accident site. The narrator's voice is heard in the background, setting the scene and describing in general terms what has happened. The pilot can be heard speaking with rescue workers on the ground in order to prepare for his landing. As the helicopter touches down, the narrator says: "[F]our of the patients are leaving by ground ambulance. Two are still trapped inside." (The first part of this statement was wrong, since only four persons were in the car to start.) After Carnahan steps from the helicopter, she can be seen and heard speaking about the situation with various rescue workers. A firefighter assures her they will hose down the area to prevent any fire from the wrecked car.

The videotape shows only a glimpse of Wayne, and his voice is never heard. Ruth is shown several times, either by brief shots of a limb or her

private facts. Five justices (Chief Justice George, Justice Kennard, Justice Baxter, Justice Brown and myself) conclude summary judgment was improper on the cause of action for intrusion. Part I of this opinion's discussion expresses the views of a majority of the court's members. (See conc. & dis. opn. of Chin, J., *post*, at p. 247.) Part II expresses a majority's views except for the reservations stated by Justice Brown. (See conc. & dis. opn. of Brown, J., *post*, at p. 249, fn. 1.)

torso, or with her features blocked by others or obscured by an oxygen mask. She is also heard speaking several times. Carnahan calls her "Ruth," and her last name is not mentioned on the broadcast.

While Ruth is still trapped under the car, Carnahan asks Ruth's age. Ruth responds, "I'm old." On further questioning, Ruth reveals she is 47, and Carnahan observes that "it's all relative. You're not that old." During her extrication from the car, Ruth asks at least twice if she is dreaming. At one point she asks Carnahan, who has told her she will be taken to the hospital in a helicopter: "Are you teasing?" At another point she says: "This is terrible. Am I dreaming?" She also asks what happened and where the rest of her family is, repeating the questions even after being told she was in an accident and the other family members are being cared for. While being loaded into the helicopter on a stretcher, Ruth says: "I just want to die." Carnahan reassures her that she is "going to do real well," but Ruth repeats: "I just want to die. I don't want to go through this."

Ruth and Wayne are placed in the helicopter, and its door is closed. The narrator states: "Once airborne, Laura and [the flight medic] will update their patients' vital signs and establish communications with the waiting trauma teams at Loma Linda." Carnahan, speaking into what appears to be a radio microphone, transmits some of Ruth's vital signs and states that Ruth cannot move her feet and has no sensation. The video footage during the helicopter ride includes a few seconds of Ruth's face, covered by an oxygen mask. Wayne is neither shown nor heard.

The helicopter lands on the hospital roof. With the door open, Ruth states while being taken out: "My upper back hurts." Carnahan replies: "Your upper back hurts. That's what you were saying up there." Ruth states: "I don't feel that great." Carnahan responds: "You probably don't."

Finally, Ruth is shown being moved from the helicopter into the hospital. The narrator concludes by stating: "Once inside both patients will be further evaluated and moved into emergency surgery if need be. Thanks to the efforts of the crew of Mercy Air, the firefighters, medics and police who responded, patients' lives were saved." As the segment ends, a brief, written epilogue appears on the screen, stating: "Laura's patient spent months in the hospital. She suffered severe back injuries. The others were all released much sooner."

The accident left Ruth a paraplegic. When the segment was broadcast, Wayne phoned Ruth in her hospital room and told her to turn on the television because "Channel 4 is showing our accident now." Shortly afterward, several hospital workers came into the room to mention that a videotaped segment of her accident was being shown. Ruth was "shocked, so to

speak, that this would be run and I would be exploited, have my privacy invaded, which is what I felt had happened." She did not know her rescue had been recorded in this manner and had never consented to the recording or broadcast. Ruth had the impression from the broadcast "that I was kind of talking nonstop, and I remember hearing some of the things I said, which were not very pleasant." Asked at deposition what part of the broadcast material she considered private, Ruth explained: "I think the whole scene was pretty private. It was pretty gruesome, the parts that I saw, my knee sticking out of the car. I certainly did not look my best, and I don't feel it's for the public to see. I was not at my best in what I was thinking and what I was saying and what was being shown, and it's not for the public to see this trauma that I was going through."

Ruth and Wayne sued the producers of *On Scene: Emergency Response*, as well as others.[3] The first amended complaint included two causes of action for invasion of privacy, one based on defendants' unlawful intrusion by videotaping the rescue in the first instance and the other based on the public disclosure of private facts, i.e., the broadcast.

Defendants moved for summary judgment, contending primarily that their conduct was protected by the First Amendment because of the broadcast's newsworthy content. In their response to the summary judgment motion, plaintiffs conceded, as undisputed facts, that an account of their accident and rescue appeared in a San Bernardino area newspaper shortly after the rescue and before the broadcast; that Mercy Air was dispatched to the scene by Riverside County officials and rendered service pursuant to Mercy Air's license and agreement with the county; and that auto accidents on public highways and publicly provided emergency rescue and medical services were both matters of public interest that constituted public affairs.

The trial court granted the media defendants' summary judgment motion, basing its ruling on plaintiffs' admissions that the accident and rescue were matters of public interest and public affairs. Those admissions, in the trial court's view, showed as a matter of law that the broadcast material was newsworthy, thereby vesting the media defendants' conduct with First Amendment protection. The court entered judgment for defendants on all causes of action.

The Court of Appeal reversed and remanded for further proceedings, but on limited grounds and as to some causes of action only. First, the Court of

---

[3]Mercy Air, Warner Brothers, Inc., and television station KNBC were originally named as defendants but have been eliminated through proceedings in the trial court and Court of Appeal, the merits of which are not before us.

Appeal held plaintiffs had no reasonable expectation of privacy in the events at the accident scene itself. According to the lower court, "Appellants' accident occurred on a heavily traveled public highway . . . . The videotape itself shows a crowd of onlookers peering down at the rescue scene below. Appellants could be seen and heard by anyone at the accident site itself and could not have had a reasonable expectation of privacy at the scene in regard to what they did or said. Their statements or exclamations could be freely heard by all who passed by and were thus public, not private." Once inside the helicopter, however, the court next reasoned, plaintiffs *did* have a reasonable expectation of privacy; the helicopter was essentially an airborne ambulance, and an ambulance in emergency medical use is considered a private space, both by social tradition and by analogy to a hospital room, which was deemed private in *Noble* v. *Sears, Roebuck & Co.* (1973) 33 Cal.App.3d 654 [109 Cal.Rptr. 269, 73 A.L.R.3d 1164].

As to Ruth's cause of action for publication of private facts (limited to the broadcast of events recorded inside the helicopter), the Court of Appeal concluded triable issues of fact existed on the element of offensiveness and on a defense of newsworthiness. With regard to plaintiffs' claims of intrusion, also as related to the recording of events in the helicopter, the Court of Appeal, citing *Hill* v. *National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1 [26 Cal.Rptr.2d 834, 865 P.2d 633], held the trial court erred in applying a complete defense of newsworthiness; instead, the trial court should have conducted an analysis balancing plaintiffs' privacy rights against defendants' First Amendment interest in recording the rescue. The Court of Appeal therefore remanded for further proceedings as to both plaintiffs' cause of action for intrusion and as to Ruth's cause of action for publication of private facts.

We conclude the Court of Appeal's judgment should be affirmed except insofar as it remanded for further proceedings on Ruth's private facts claim. With regard to that claim, we hold that the material broadcast was newsworthy as a matter of law and, therefore, cannot be the basis for tort liability under a private facts claim. Summary judgment thus was proper as to both plaintiffs on the private facts cause of action.

As to intrusion, the Court of Appeal correctly found triable issues exist as to whether defendants invaded plaintiffs' privacy by accompanying plaintiffs in the helicopter. Contrary to the holding below, we also hold triable issues exist as to whether defendants tortiously intruded by listening to Ruth's confidential conversations with Nurse Carnahan at the rescue scene without Ruth's consent. Moreover, we hold defendants had no constitutional privilege so to intrude on plaintiffs' seclusion and private communications.

DISCUSSION

Influenced by Dean Prosser's analysis of the tort actions for invasion of privacy (Prosser, *Privacy* (1960) 48 Cal.L.Rev. 381) and the exposition of a similar analysis in the Restatement Second of Torts sections 652A-652E (further references to the Restatement are to the Restatement Second of Torts), California courts have recognized both of the privacy causes of action pleaded by plaintiffs here: (1) public disclosure of private facts, and (2) intrusion into private places, conversations or other matters. (See *Forsher* v. *Bugliosi* (1980) 26 Cal.3d 792, 808 [163 Cal.Rptr. 628, 608 P.2d 716]; *Kapellas* v. *Kofman* (1969) 1 Cal.3d 20, 35-36 [81 Cal.Rptr. 360, 459 P.2d 912]; *Miller* v. *National Broadcasting Co.* (1986) 187 Cal.App.3d 1463, 1482 [232 Cal.Rptr. 668, 69 A.L.R.4th 1027]; *Diaz* v. *Oakland Tribune, Inc.* (1983) 139 Cal.App.3d 118, 126 [188 Cal.Rptr. 762] (*Diaz*).)[4]

We shall review the elements of each privacy tort, as well as the common law and constitutional privilege of the press as to each, and shall apply in succession this law to the facts pertinent to each cause of action.

I. *Publication of Private Facts*

■■■ The claim that a publication has given unwanted publicity to allegedly private aspects of a person's life is one of the more commonly litigated and well-defined areas of privacy law. In *Diaz, supra,* 139 Cal.App.3d at page 126, the appellate court accurately discerned the following elements of the public disclosure tort: "(1) public disclosure (2) of a private fact (3) which would be offensive and objectionable to the reasonable person and (4) which is not of legitimate public concern." (See *Forsher* v. *Bugliosi, supra,* 26 Cal.3d at pp. 808-809; *Gill* v. *Hearst Publishing Co.* (1953) 40 Cal.2d 224, 228-231 [253 P.2d 441]; *Carlisle* v. *Fawcett Publications, Inc.* (1962) 201 Cal.App.2d 733, 744-748 [20 Cal.Rptr. 405].) That formulation does not differ significantly from the Restatement's, which provides that "[o]ne who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that [¶] (a) would be highly offensive to a reasonable person, and [¶] (b) is not of legitimate concern to the public." (Rest.2d Torts, § 652D.)

The element critical to this case is the presence or absence of legitimate public interest, i.e., newsworthiness, in the facts disclosed. ■■■ After reviewing the decisional law regarding newsworthiness, we conclude, inter

---

[4]The other two "Prosser torts" are presentation of the plaintiff to the public in a false light and appropriation of image or personality. (See *Kapellas* v. *Kofman, supra,* 1 Cal.3d at p. 35, fn. 16.)

alia, that lack of newsworthiness is an element of the "private facts" tort, making newsworthiness a complete bar to common law liability. We further conclude that the analysis of newsworthiness inevitably involves accommodating conflicting interests in personal privacy and in press freedom as guaranteed by the First Amendment to the United States Constitution, and that in the circumstances of this case—where the facts disclosed about a private person involuntarily caught up in events of public interest bear a logical relationship to the newsworthy subject of the broadcast and are not intrusive in great disproportion to their relevance—the broadcast was of legitimate public concern, barring liability under the private facts tort.

The *Diaz* formulation, like the Restatement's, includes as a tort element that the matter published is not of legitimate public concern. *Diaz* thus expressly makes the *lack* of newsworthiness part of the plaintiff's case in a private facts action. (See also *Diaz, supra,* 139 Cal.App.3d at pp. 128-130 [plaintiff bears burden of proving published matter was not newsworthy].) Our own decisions are consistent, if less explicit, on this point. (See *Forsher* v. *Bugliosi, supra,* 26 Cal.3d at p. 809 [The defendant's First Amendment right to disseminate information to the public must be considered "[i]n determining whether a cause of action [for publication of private facts] has been stated . . . ."]; *Gill* v. *Curtis Publishing Co.* (1953) 38 Cal.2d 273, 278 [239 P.2d 630] [Public interest in the dissemination of news and information must be balanced against the privacy right "in defining the boundaries of the right."].) The *Diaz* approach is consistent with the tort's historical development, in which defining an actionable invasion of privacy has generally been understood to require balancing privacy interests against the press's right to report, and the community's interest in receiving, news and information. (See Brandeis, *supra,* 4 Harv. L.Rev. at p. 214; *Melvin* v. *Reid, supra,* 112 Cal.App. at p. 290; *Sidis* v. *F-R Publishing Corporation* (2d Cir. 1940) 113 F.2d 806, 809; *Barber* v. *Time, Inc.* (1942) 348 Mo. 1199, 1206 [159 S.W.2d 291]; *Carlisle* v. *Fawcett Publications, Inc., supra,* 201 Cal.App.2d at p. 745; *Gill* v. *Curtis Publishing Co., supra,* 38 Cal.2d at p. 277; *Briscoe* v. *Reader's Digest Association, Inc., supra,* 4 Cal.3d at p. 534.)

We therefore agree with defendants that under California common law the dissemination of truthful, newsworthy material is not actionable as a publication of private facts. (*Kapellas* v. *Kofman, supra,* 1 Cal.3d at pp. 35-36; *Diaz, supra,* 139 Cal.App.3d at p. 126; Rest.2d Torts, § 652D.) If the contents of a broadcast or publication are of legitimate public concern, the plaintiff cannot establish a necessary element of the tort action, the lack of newsworthiness. To so state, however, is merely to begin the necessary legal inquiry, not to end it. It is in the determination of newsworthiness—in deciding whether published or broadcast material is of legitimate public

concern—that courts must struggle most directly to accommodate the conflicting interests of individual privacy and press freedom.

Although we speak of the lack of newsworthiness as an element of the private facts tort, newsworthiness is at the same time a constitutional defense to, or privilege against, liability for publication of truthful information. (*Forsher* v. *Bugliosi, supra,* 26 Cal.3d at p. 809; *Gilbert* v. *Medical Economics Co.* (10th Cir. 1981) 665 F.2d 305, 307-308; *Vassiliades* v. *Garfinckel's Brooks Bros.* (D.C. 1985) 492 A.2d 580, 589.) Indeed, the danger of interference with constitutionally protected press freedom has been and remains an ever-present consideration for courts and commentators struggling to set the tort's parameters, and the requirements of tort law and the Constitution have generally been assumed to be congruent. (See Rest.2d Torts, § 652D, com. d, p. 388 [newsworthiness standard developed in common law but now expresses constitutional limit as well]; *Virgil* v. *Time, Inc.* (9th Cir. 1975) 527 F.2d 1122, 1128-1130 [accepting Restatement test of newsworthiness as constitutional standard]; *Ross* v. *Midwest Communications, Inc.* (5th Cir. 1989) 870 F.2d 271, 273 [Stating of Texas law, which follows the Restatement, that "[i]n the 'newsworthiness' line of argument . . . the state law and constitutional tests are the same."].) Little is to be gained, therefore, in attempting to keep rigorously separate the tort and constitutional issues as regards newsworthiness, and we have not attempted to do so here. Tort liability, obviously, can extend no further than the First Amendment allows; conversely, we see no reason or authority for fashioning the newsworthiness element of the private facts tort to *preclude* liability where the Constitution would allow it.

Delineating the exact contours of the constitutional privilege of the press in publication of private facts is, however, particularly problematic, because this privilege has not received extensive attention from the United States Supreme Court. The high court has considered the issue in only one case involving the common law public disclosure tort, *Cox Broadcasting Corp.* v. *Cohn* (1975) 420 U.S. 469 [95 S.Ct. 1029, 43 L.Ed.2d 328] (*Cox Broadcasting*), and its holding in that case was deliberately and explicitly narrow. In *Cox Broadcasting*, a criminal court clerk, during a recess in court proceedings relating to a rape-murder case, allowed a television reporter to see the indictment, which contained the name of the victim. The television station broadcast an account of the court proceedings, using the victim's name; the victim's father alleged the broadcast to be a tortious publication of private facts. (*Id.* at pp. 471-474 [95 S.Ct. at pp. 1034-1035].) The Georgia Supreme Court, relying on a Georgia statute prohibiting publication or broadcast of a rape victim's identity, held the broadcast of the victim's name was not privileged as newsworthy; the court viewed the statute as showing that the

victim's identity was not a matter of legitimate public concern. The state court further held the statute did not itself infringe on the station's First Amendment rights. (*Id.* at p. 475 [95 S.Ct. at p. 1035].)

The federal high court reversed, but—recognizing the important interests on both sides of the newsworthiness question—proceeded cautiously and on limited grounds. "Rather than address the broader question of whether truthful publications may ever be subjected to civil or criminal liability consistently with the First and Fourteenth Amendments, or to put it another way, whether the State may ever define and protect an area of privacy free from unwanted publicity in the press, it is appropriate to focus on the narrower interface between press and privacy that this case presents, namely, whether the State may impose sanctions on the accurate publication of the name of a rape victim obtained from public records—more specifically, from judicial records which are maintained in connection with a public prosecution and which themselves are open to public inspection. We are convinced that the State may not do so." (*Cox Broadcasting, supra,* 420 U.S. at p. 491 [95 S.Ct. at p. 1044].) For this holding the court relied on the "responsibility of the press to report the operations of government" (*id.* at p. 492 [95 S.Ct. at p. 1045]), including judicial proceedings regarding crimes, and on the premise that "[b]y placing the information in the public domain on official court records, the State must be presumed to have concluded that the public interest was thereby being served" (*id.* at p. 495 [95 S.Ct. at p. 1046]).

A more recent case cited by defendants, *The Florida Star* v. *B. J. F.* (1989) 491 U.S. 524 [109 S.Ct. 2603, 105 L.Ed.2d 443] (*Florida Star*), reached a similar conclusion with regard to a Florida statute that, like the Georgia law in *Cox Broadcasting,* criminally punished the publication of a sexual assault victim's name. In *Florida Star,* however, the plaintiff's civil action was not pled as the common law tort for publication of private facts, but rather as a negligence action (with the criminal statute used as predicate for application of the negligence per se doctrine), a distinction the high court relied upon in holding liability to be constitutionally barred. (*Id.* at p. 539 [109 S.Ct. at p. 2612].) Here, again, the high court chose to move cautiously, "relying on limited principles that sweep no more broadly than the appropriate context of the instant case." (*Id.* at p. 533 [109 S.Ct. at p. 2609].) The limited principle relied upon in *Florida Star* was that " '[I]f a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order.' " (*Ibid.*) Like *Cox Broadcasting,* the *Florida Star* decision provides little general guidance as to what is, and is not, "a matter of public significance"—what is newsworthy, in other words—or as to when, if ever, the protection of private facts

against public disclosure should be considered a sufficiently important state interest to justify civil liability pursuant to the common law tort. As in *Cox Broadcasting*, moreover, the *Florida Star* newspaper had obtained the victim's name from a public records source, in this case a police report made available to the press. The high court's holding that publication was constitutionally protected again rested in large part on the fact the government had, by making the information available to the press, impliedly determined its dissemination was in the public interest, and could not then punish a newspaper for "rely[ing] on the government's implied representations of the lawfulness of dissemination." (*Florida Star, supra*, 491 U.S. at p. 536 [109 S.Ct. at p. 2610].)

One federal court has observed that, despite the limited scope of their holdings, "the implications of [*Cox Broadcasting* and *Florida Star*] for the branch of the right of privacy that limits the publication of private facts are profound . . . . The Court must believe that the First Amendment greatly circumscribes the right even of a private figure to obtain damages for the publication of newsworthy facts about him, even when they are facts of a kind that people want very much to conceal." (*Haynes* v. *Alfred A. Knopf, Inc.* (7th Cir. 1993) 8 F.3d 1222, 1232.) We agree the high court's decisions are instructive on the strength of First Amendment protection for truthful publication of private facts. More particularly, they establish that truthful reporting on current judicial proceedings, using material drawn from public records, is generally within the scope of constitutional protection. The decisions do not, however, enunciate a general test of newsworthiness applicable to other factual circumstances or provide a broad theoretical basis for discovery of such a general constitutional standard. (See Woito & McNulty, *The Privacy Disclosure Tort and the First Amendment: Should the Community Decide Newsworthiness?* (1978) 64 Iowa L.Rev. 185, 199-202.)

Newsworthiness—constitutional or common law—is also difficult to define because it may be used as either a descriptive or a normative term. "Is the term 'newsworthy' a descriptive predicate, intended to refer to the fact there is widespread public interest? Or is it a value predicate, intended to indicate that the publication is a meritorious contribution and that the public's interest is praiseworthy?" (Comment, *The Right of Privacy: Normative-Descriptive Confusion in the Defense of Newsworthiness* (1963) 30 U. Chi. L.Rev. 722, 725.) A position at either extreme has unpalatable consequences. If "newsworthiness" is completely descriptive—if all coverage that sells papers or boosts ratings is deemed newsworthy—it would seem to swallow the publication of private facts tort, for "it would be difficult to suppose that publishers were in the habit of reporting occurrences of little interest." (*Id.* at p. 734.) At the other extreme, if newsworthiness is viewed

as a purely normative concept, the courts could become to an unacceptable degree editors of the news and self-appointed guardians of public taste.

The difficulty of finding a workable standard in the middle ground between the extremes of normative and descriptive analysis, and the variety of factual circumstances in which the issue has been presented, have led to considerable variation in judicial descriptions of the newsworthiness concept. As one commentator has noted, the newsworthiness test "bears an enormous social pressure, and it is not surprising to find that the common law is deeply confused and ambivalent about its application." (Post, *The Social Foundations of Privacy: Community and Self in the Common Law Tort* (1989) 77 Cal.L.Rev. 957, 1007.) Without attempting an exhaustive survey, and with particular focus on California decisions, we review some of these attempts below.

In the first California privacy case, *Melvin* v. *Reid, supra,* 112 Cal.App. 285, the defendants, using the plaintiff's true maiden name, had produced and exhibited a motion picture based on events of the plaintiff's life, including her having been a prostitute many years earlier. (*Id.* at pp. 286-287.) The appellate court held the use of the plaintiff's true name "was unnecessary and indelicate, and a willful and wanton disregard of that charity which should actuate us in our social intercourse." (*Id.* at p. 291.) In short, such use was "not justified by any standard of morals or ethics known to us." (*Id.* at p. 292.)

This court took a similar, albeit less overtly moralistic, approach in *Gill* v. *Curtis Publishing Co., supra,* 38 Cal.2d 273 (*Gill* v. *Curtis*), involving a Ladies Home Journal article entitled *Love* that used a photograph of the plaintiffs embracing to illustrate the "wrong" kind of love, "founded upon 100 per cent sex attraction." (*Id.* at p. 275.) As the Court of Appeal had done in *Melvin* v. *Reid, supra,* 112 Cal.App. 285, we attempted to distinguish a disclosure of private facts that was closely connected to the newsworthiness of the publication from one that superfluously exposed the subject's private life to public view. Assuming the article's contents "to be within the range of public interest in dissemination of news, information or education," still "the public interest did not require the use of any particular person's likeness nor that of plaintiffs without their consent." (*Gill* v. ·*Curtis, supra,* at p. 279.) Although we therefore did not need to decide on a general standard of newsworthiness, we noted that "[f]actors deserving consideration may include the medium of publication, the extent of the use, the public interest served by the publication, and the seriousness of the interference with the person's privacy." (*Id.* at pp. 278-279.)

A year later, without explicitly overruling *Gill* v. *Curtis,* we reached a seemingly inconsistent conclusion in another case involving the same publication. (*Gill* v. *Hearst Publishing Co., supra,* 40 Cal.2d 224 (*Gill* v.

*Hearst*).) We held no action for invasion of privacy would lie solely for publication of the *photograph* of the plaintiffs embracing. The photograph itself, we reasoned, enjoyed some measure of constitutional protection despite its slight or nonexistent informational value. "Apparently the picture has no particular news value but is designed to serve the function of entertainment as a matter of legitimate public interest. [Citation.] However, the constitutional guarantees of freedom of expression apply with equal force to the publication whether it be a news report or an entertainment feature . . . ." (*Id.* at p. 229.)[5] The author of *Gill* v. *Curtis* dissented from this portion of *Gill* v. *Hearst*, arguing, "it should be quite obvious that there is no news or educational value whatsoever in the photograph alone. It depicts two persons (plaintiffs) in an amorous pose. . . . While some remote news significance might be attached to persons in such a pose on the theory that the public likes and is entitled to see persons in such a pose, there is no reason why the publisher need invade the privacy of John and Jane Doe for his purpose. He can employ models for that purpose and the portion of the public interested will never know the difference but its maudlin curiosity will be appeased." (*Gill* v. *Hearst, supra,* 40 Cal.2d at p. 232 (conc. & dis. opn. of Carter, J.).)

This court next addressed the question in *Kapellas* v. *Kofman, supra,* 1 Cal.3d 20 (*Kapellas*), involving a newspaper editorial that allegedly violated the privacy rights of the children of a woman running for public office by revealing certain juvenile offenses and peccadilloes for which the children had been arrested or detained. Drawing from academic comment and the two *Gill* decisions, we attempted a general analysis involving the balancing of three factors: "In determining whether a particular incident is 'newsworthy' and thus whether the privilege shields its truthful publication from liability, the courts consider a variety of factors, including the social value of the facts published, the depth of the article's intrusion into ostensibly private affairs, and the extent to which the party voluntarily acceded to a position of public notoriety." (*Kapellas, supra,* at p. 36.) Applying these factors, we articulated a general rule favoring dissemination of relevant information regarding candidates for public office, including at least some information about their families: "Generally, courts will be most reluctant to impede the free flow of any truthful information that may be relevant to a candidate's qualifications for office. Although the conduct of a candidate's children in many cases may not appear particularly relevant to his qualifications for office, normally the public should be permitted to determine the importance or relevance of the

---

[5]We went on to hold that publication of the photograph, taken at the plaintiffs' ice cream booth in the Los Angeles Farmers' Market, "did not disclose anything which until then had been private," nor was the depiction of the plaintiffs objectionable or offensive to a reasonable person. (*Gill* v. *Hearst, supra,* 40 Cal.2d at pp. 230-231.)

reported facts for itself. If the publication does not proceed widely beyond the bounds of propriety and reason in disclosing facts about those closely related to an aspirant for public office, the compelling public interest in the unfettered dissemination of information will outweigh society's interest in preserving such individuals' rights to privacy." (*Id.* at pp. 37-38, fn. omitted.) Following the articulated principle, we held the information disclosed, if true, was absolutely privileged. (*Id.* at p. 39.)

We employed the *Kapellas* factors in *Briscoe* v. *Reader's Digest Association, Inc., supra,* 4 Cal.3d 529 (*Briscoe*). A magazine article on truck hijacking included a description of such a crime the plaintiff had committed 11 years earlier, using the plaintiff's true name. Conceding that "reports of the facts of past crimes are newsworthy" (*id.* at p. 537), we nonetheless concluded a jury could reasonably find the plaintiff's *identity* as a former hijacker to be nonnewsworthy. The identification of a rehabilitated person as a former criminal was, under the circumstances, of "minimal social value" (*id.* at p. 541), would tend to interfere with the state's interest in rehabilitating criminals and returning them to society, and could be regarded as a serious intrusion on private matters (*id.* at p. 542).[6]

In *Briscoe*, while employing *Kapellas's* analysis of competing interests, we also recognized the strong constitutional policy against fact-dependent balancing of First Amendment rights against other interests. "Because the categories with which we deal—private and public, newsworthy and non-newsworthy—have no clear profile, there is a temptation to balance interests in ad hoc fashion in each case. Yet history teaches us that such a process leads too often to discounting society's stake in First Amendment rights. [Citation.] We therefore strive for as much predictability as possible within our system of case-by-case adjudication, lest we unwittingly chill First Amendment freedoms." (*Briscoe, supra,* 4 Cal.3d at pp. 542-543, fn. 18.) We believed, however, the danger of chilling future expression by our holding in *Briscoe* was slight because the facts of the case clearly negated protection.

---

[6]Our discussion in *Briscoe* largely reflects the correct view that newsworthiness is a complete bar against liability for publication of truthful private facts. In one passage, however, we articulated the possibly different view that "a truthful publication is constitutionally protected if (1) it is newsworthy and (2) it does not reveal facts so offensive as to shock the community's notions of decency." (*Briscoe, supra,* 4 Cal.3d at p. 541.) We derived this dual standard from a dictum in *Time, Inc.* v. *Hill, supra,* 385 U.S. at page 383, footnote 7 [87 S.Ct. at pages 539-540]. The *Time* footnote, however, concerned newsworthiness as a defense to liability under a New York statute and merely suggested that such a defense may not exist when the publication is " 'so intimate and so unwarranted . . . as to outrage the community's notions of decency.' " (*Ibid.*) Rather than establishing a requirement separate from newsworthiness, the *Time* dictum appears to fit within the analysis of newsworthiness as a balancing of intrusion against justification that we adopted in *Kapellas* and applied in *Briscoe.*

(*Ibid.*) Our holding of possible liability in that case, moreover, was expressly limited to narrow circumstances to be established at trial: that the plaintiff, having been punished for his past crime, was now "a rehabilitated member of society"; that identification of him as a former criminal was not only highly offensive but "injurious" to his efforts at leading an ordinary law-abiding life; that the publication was made with reckless disregard for its offensiveness; and that the defendant had no "independent justification" for printing plaintiff's identity. (*Id.* at p. 543.)

In the most recent of this court's decisions on publication of private facts, we applied the same general analysis of newsworthiness as in *Briscoe* but distinguished that case on its facts. (*Forsher* v. *Bugliosi, supra*, 26 Cal.3d at pp. 809-813 (*Forsher*).) We held the defendant's book, Helter-Skelter, did not invade the plaintiff's privacy by mentioning his name in connection with the disappearance of an attorney who had represented a defendant in the highly publicized Tate-LaBianca killings. *Briscoe*, we observed, was "an exception to the more general rule that 'once a man has become a public figure, or news, he remains a matter of legitimate recall to the public mind to the end of his days.' " (*Forsher, supra*, at p. 811.) As the exceptional reasons for protecting Briscoe's identity did not apply to Forsher, we concluded the identification of Forsher in connection with the death of an attorney formerly involved in the case was of continuing public concern at the time of publication. (*Id.* at p. 813.)

██ Our prior decisions have not explicitly addressed the type of privacy invasion alleged in this case: the broadcast of embarrassing pictures and speech of a person who, while generally not a public figure, has become involuntarily involved in an event or activity of legitimate public concern. We nonetheless draw guidance from those decisions, in that they articulate the competing interests to be balanced. First, the analysis of newsworthiness does involve courts to some degree in a normative assessment of the "social value" of a publication. (*Kapellas, supra*, 1 Cal.3d at p. 36.) All material that might attract readers or viewers is not, simply by virtue of its attractiveness, of *legitimate* public interest. Second, the evaluation of newsworthiness depends on the degree of intrusion and the extent to which the plaintiff played an important role in public events (*ibid.*), and thus on a comparison between the information revealed and the nature of the activity or event that brought the plaintiff to public attention. "Some reasonable proportion is . . . to be maintained between the events or activity that makes the individual a public figure and the private facts to which publicity is given. Revelations that may properly be made concerning a murderer or the President of the United States would not be privileged if they were to be made concerning

one who is merely injured in an automobile accident." (Rest.2d Torts, § 652D, com. h, p. 391.)[7]

Courts balancing these interests in cases similar to this have recognized that, when a person is involuntarily involved in a newsworthy incident, not all aspects of the person's life, and not everything the person says or does, is thereby rendered newsworthy. "Most persons are connected with some activity, vocational or avocational, as to which the public can be said as a matter of law to have a legitimate interest or curiosity. To hold as a matter of law that private facts as to such persons are also within the area of legitimate public interest could indirectly expose everyone's private life to public view." (*Virgil* v. *Time, Inc., supra*, 527 F.2d at p. 1131; accord, *Gilbert* v. *Medical Economics Co., supra*, 665 F.2d at p. 308 (*Gilbert*).) This principle is illustrated in the decisions holding that, while a particular event was newsworthy, identification of the plaintiff as the person involved, or use of the plaintiff's identifiable image, added nothing of significance to the story and was therefore an unnecessary invasion of privacy. (See *Briscoe, supra*, 4 Cal.3d at p. 541 [identification of plaintiff as former criminal]; *Gill* v. *Curtis, supra*, 38 Cal.2d at p. 279 [use of plaintiffs' photograph to illustrate article on love]; *Melvin* v. *Reid, supra*, 112 Cal.App. at pp. 291-292 [identification of plaintiff as former prostitute]; *Barber* v. *Time, Inc., supra*, 348 Mo. at pp. 1207-1208 [159 S.W.2d at pp. 295-296] [use of plaintiff's name and photograph in article about her unusual medical condition]; *Vassiliades* v. *Garfinckel's Brooks Bros., supra*, 492 A.2d at pp. 589-590 [use of plaintiff's photograph to illustrate presentations on cosmetic surgery].) For the same reason, a college student's candidacy for president of the student body did not render newsworthy a newspaper's revelation that the student was a transsexual, where the court could find "little if any connection between the information disclosed and [the student's] fitness for office." (*Diaz, supra*, 139 Cal.App.3d at p. 134.) Similarly, a mother's private words over the body of her slain son as it lay in a hospital room were held nonnewsworthy despite undisputed legitimate public interest in the subjects of gang violence and murder. (*Green* v. *Chicago Tribune Co.* (1996) 286 Ill.App.3d 1 [221 Ill.Dec. 342, 675 N.E.2d 249, 255-256].)

Consistent with the above, courts have generally protected the privacy of otherwise private individuals involved in events of public interest "by

---

[7]Justice Brown, in her concurring and dissenting opinion, argues the lawfulness or offensiveness of the news media's conduct, discussed in part II of this opinion (*post*, at p. 230 et seq.), is "clearly relevant" not only to the tort of intrusion into private places, conversations or other matters, but also to whether the material published is "newsworthy." (Conc. & dis. opn. of Brown, J., *post*, at p. 252, fn. 2.) Citing no other authority, Justice Brown attempts to find support for her argument in *Kapellas, supra*, 1 Cal.3d at page 36. The court in *Kapellas*, however, did not mention or address any issue arising from the legality of the manner in which information had been gathered. Indeed, the facts published in *Kapellas* were presumed by the court "already [to] have been matters of public record." (*Id.* at p. 38.)

requiring that a logical nexus exist between the complaining individual and the matter of legitimate public interest." (*Campbell* v. *Seabury Press* (5th Cir. 1980) 614 F.2d 395, 397.) The contents of the publication or broadcast are protected only if they have "some substantial relevance to a matter of legitimate public interest." (*Gilbert, supra*, 665 F.2d at p. 308.) Thus, recent decisions have generally tested newsworthiness with regard to such individuals by assessing the logical relationship or nexus, or the lack thereof, between the events or activities that brought the person into the public eye and the particular facts disclosed. These decisions have used a number of similar or equivalent phrases to describe the necessary relationship. (See *Cinel* v. *Connick* (5th Cir. 1994) 15 F.3d 1338, 1346 ["substantially related"]; *Ross* v. *Midwest Communications, Inc., supra*, 870 F.2d at p. 274 [5th Cir.: "logical nexus"]; *Campbell* v. *Seabury Press, supra*, 614 F.2d at p. 397 [5th Cir.: "logical nexus"]; *Gilbert, supra*, 665 F.2d at p. 308 [10th Cir.: "substantial relevance"]; *Lee* v. *Calhoun* (10th Cir. 1991) 948 F.2d 1162, 1165-1166 [following *Gilbert*]; *Haynes* v. *Alfred A. Knopf, Inc., supra*, 8 F.3d at p. 1233 [facts "germane" to story]; *Vassiliades* v. *Garfinckel's Brooks Bros., supra*, 492 A.2d at p. 590 ["logical nexus"].) This approach accords with our own prior decisions, in that it balances the public's right to know against the plaintiff's privacy interest by drawing a protective line at the point the material revealed ceases to have any substantial connection to the subject matter of the newsworthy report. (Cf. *Kapellas, supra*, 1 Cal.3d at p. 37 [in context of political candidacy, truthful information is generally protected if it "may be relevant" to qualifications for office].) This approach also echoes the Restatement commentators' widely quoted and cited view that legitimate public interest does not include "a morbid and sensational prying into private lives *for its own sake* . . . ." (Rest.2d Torts, § 652D, com. h, p. 391, italics added; see, e.g., *Sipple* v. *Chronicle Publishing Co.* (1984) 154 Cal.App.3d 1040, 1048-1049 [201 Cal.Rptr. 665]; *Virgil* v. *Time, Inc., supra*, 527 F.2d at p. 1129; *Gilbert, supra*, 665 F.2d at pp. 307-308; see also *Haynes* v. *Alfred A. Knopf, Inc., supra*, 8 F.3d at p. 1232 [private facts not newsworthy "when the community has no interest in them beyond the voyeuristic thrill of penetrating the wall of privacy that surrounds a stranger"].)

An analysis measuring newsworthiness of facts about an otherwise private person involuntarily involved in an event of public interest by their relevance to a newsworthy subject matter incorporates considerable deference to reporters and editors, avoiding the likelihood of unconstitutional interference with the freedom of the press to report truthfully on matters of

legitimate public interest.[8] In general, it is not for a court or jury to say how a particular story is best covered. The constitutional privilege to publish truthful material "ceases to operate only when an editor abuses his broad discretion to publish matters that are of legitimate public interest." (*Gilbert, supra,* 665 F.2d at p. 308.) By confining our interference to extreme cases, the courts "avoid[] unduly limiting . . . the exercise of effective editorial judgment." (*Virgil* v. *Time, Inc., supra,* 527 F.2d at p. 1129.) Nor is newsworthiness governed by the tastes or limited interests of an individual judge or juror; a publication is newsworthy if some reasonable members of the community could entertain a legitimate interest in it. Our analysis thus does not purport to distinguish among the various legitimate purposes that may be served by truthful publications and broadcasts. As we said in *Gill* v. *Hearst, supra,* 40 Cal.2d at page 229, "the constitutional guarantees of freedom of expression apply with equal force to the publication whether it be a news report or an entertainment feature . . . ." Thus, newsworthiness is not limited to "news" in the narrow sense of reports of current events. "It extends also to the use of names, likenesses or facts in giving information to the public for purposes of education, amusement or enlightenment, when the public may reasonably be expected to have a legitimate interest in what is published." (Rest.2d Torts, § 652D, com. j, p. 393; accord, *Gilbert, supra,* 665 F.2d at p. 308; *Virgil* v. *Time, Inc., supra,* 527 F.2d at p. 1129; see also *Carlisle* v. *Fawcett Publications, Inc., supra,* 201 Cal.App.2d at p. 746 [matters of legitimate public interest include, for example, "the reproduction of past events, travelogues and biographies"]; *Vassiliades* v. *Garfinckel's Brooks Bros., supra,* 492 A.2d at p. 589 [includes " 'information concerning interesting phases of human activity' "].)

Finally, an analysis focusing on relevance allows courts and juries to decide most cases involving persons involuntarily involved in events of public interest without "balanc[ing] interests in ad hoc fashion in each case" (*Briscoe, supra,* 4 Cal.3d at p. 542, fn. 18). The articulation of standards that do not require "*ad hoc* resolution of the competing interest in each . . .

---

[8]Although we therefore believe our conclusions in this case accord with the dictates of the federal Constitution, we cannot be sure without clearer guidance from the United States Supreme Court. Unless we abandon the private facts tort completely, we appear to be at a theoretical risk of creating unconstitutional liability, since the high court has thus far declined to decide "whether truthful publications may ever be subjected to civil or criminal liability consistently with the First and Fourteenth Amendments, or to put it another way, whether the State may ever define and protect an area of privacy free from unwanted publicity in the press. . . ." (*Cox Broadcasting Corp., supra,* 420 U.S. at p. 491 [95 S.Ct. at p. 1044]; see also *Florida Star, supra,* 491 U.S. at p. 533 [109 S.Ct. at p. 2609] [again declining to answer that question]; *Time, Inc.* v. *Hill, supra,* 385 U.S. at p. 383, fn. 7 [87 S.Ct. at pp. 539-540] [in false light privacy case, reserving question whether *truthful* publication of offensive private facts may constitutionally be punished, and noting a commentator's view that newsworthiness privilege may be so " 'overpowering as virtually to swallow the [privacy] tort' "].)

case" (*Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 343 [94 S.Ct. 2997, 3009, 41 L.Ed.2d 789]) is favored in areas affecting First Amendment rights, because the relative predictability of results reached under such standards minimizes the inadvertent chilling of protected speech, and because standards that can be applied objectively provide a stronger shield against the unconstitutional punishment of unpopular speech. (*Ibid.*; Nimmer, *The Right to Speak from* Times *to* Time: *First Amendment Theory Applied to Libel and Misapplied to Privacy* (1968) 56 Cal.L.Rev. 935, 938-945 (hereafter Nimmer); see also *Reno* v. *American Civil Liberties Union* (1997) 521 U.S. 844 [117 S.Ct. 2329, 2341, 2344-2345, 138 L.Ed.2d 874] [Internet speech prohibitions employing undefined term "indecent" and appealing to "community standards" of what is "patently offensive" are, absent further narrowing of prohibitions, unconstitutionally vague and uncertain.].)

On the other hand, no mode of analyzing newsworthiness can be applied mechanically or without consideration of its proper boundaries. To observe that the newsworthiness of private facts about a person involuntarily thrust into the public eye depends, in the ordinary case, on the existence of a logical nexus between the newsworthy event or activity and the facts revealed is not to deny that the balance of free press and privacy interests may require a different conclusion when the intrusiveness of the revelation is greatly disproportionate to its relevance. Intensely personal or intimate revelations might not, in a given case, be considered newsworthy, especially where they bear only slight relevance to a topic of legitimate public concern. (See *Kapellas, supra,* 1 Cal.3d at pp. 37-38 [public interest in free flow of information will outweigh interest in individual privacy "[i]f the publication does not proceed widely beyond the bounds of propriety and reason in disclosing facts about those closely related to an aspirant for public office . . ."]; *Haynes* v. *Alfred A. Knopf, Inc., supra,* 8 F.3d at pp. 1234-1235 [although personal facts revealed in book at issue were newsworthy because germane to the book's subject matter, that protection may not extend to publication of "intimate physical details the publicizing of which would be not merely embarrassing and painful but deeply shocking to the average person"].)[9]

A few words are in order at this point regarding the right of privacy secured by article I, section 1 of the California Constitution. The Court of

---

[9]Contrary to Justice Brown's characterization of the foregoing test for newsworthiness as a "radical departure" from *Kapellas, supra,* 1 Cal.3d 20 (conc. & dis. opn. of Brown, J., *post,* at p. 251), the stated test is a natural adaptation of *Kapellas* to a different kind of situation, one involving a private figure involuntarily caught up in a newsworthy *event.* (Cf. *Forsher, supra,* 26 Cal.3d at p. 812 [applying both the *Kapellas* factors and additional relevant considerations].) To track the language of *Kapellas, supra,* 1 Cal.3d at page 36, the "incident" in this case—i.e., the accident and rescue—concededly is of legitimate public concern. Viewing, therefore, the "facts published" in the context of the whole, the broadcast's intrusion into Ruth's private life is minimal as against the substantial relevance the facts bear to the subject

Appeal, citing *Hill* v. *National Collegiate Athletic Assn.*, *supra*, 7 Cal.4th at pages 37-38 (*Hill*), equated the judicial balancing undertaken in delineation of the common law right of privacy to the balancing of interests this court has prescribed for evaluating claims raised under our state's constitutional right of privacy. Defendants attack the Court of Appeal's adoption of *Hill*'s balancing test in the common law tort context, arguing that under the *federal* Constitution newsworthiness is a complete bar to liability, rather than merely an interest to be balanced against private or state-protected interests.

We agree with defendants that the publication of truthful, lawfully obtained material of legitimate public concern is constitutionally privileged and does not create liability under the private facts tort. As discussed above, however, a certain amount of interest-balancing *does* occur in deciding whether material is of legitimate public concern, or in formulating rules for that decision. To that extent, the Court of Appeal's analogy to *Hill* was not in error.

In *Hill*, we held, inter alia, that article I, section 1 of the California Constitution protects Californians against invasions of privacy by nongovernmental as well as governmental parties. (*Hill*, *supra*, 7 Cal.4th at pp. 15-20.) Decisions concerning the tort actions for invasion of privacy have, in addition, sometimes linked the plaintiffs' protected interest to that constitutional provision. (See, e.g., *Miller* v. *National Broadcasting Co.*, *supra*, 187 Cal.App.3d at pp. 1490-1491 [intrusion plaintiff's interest protected by constitutional privacy provision]; *Melvin* v. *Reid*, *supra*, 112 Cal.App. at p. 291 [in private facts case predating addition of "privacy" to article I, section 1, plaintiff deemed protected by that section's guarantee of right to pursue and obtain happiness].) The *Hill* court itself sought to "draw upon the one hundred years of legal experience surrounding the term 'privacy' " in formulating the correct analysis of claims brought under the state Constitution. (*Hill*, *supra*, 7 Cal.4th at p. 27.) Thus, these two sources of protection for privacy—the common law and the state Constitution—are not unrelated. Nothing in *Hill* or our more recent constitutional privacy cases (*American Academy of Pediatrics* v. *Lungren* (1997) 16 Cal.4th 307 [66 Cal.Rptr.2d 210, 940 P.2d 797]; *Loder* v. *City of Glendale* (1997) 14 Cal.4th 846 [59 Cal.Rptr.2d 696, 927 P.2d 1200]), however, suggests that the conceptual framework developed for resolving privacy claims under the California Constitution was intended to supplant the common law tort analysis or preclude its independent development. Nor did we have occasion in those cases to address the analytical means by which a state-created privacy right,

matter, in particular the various aspects of the rescue and Nurse Carnahan's responsibilities in connection therewith. That Ruth did not "voluntarily accede[] to a position of public notoriety" is not determinative, but only one of a "variety of factors" to be weighed. (*Ibid.*)

whether of constitutional or common law origin, may be accommodated to conflicting and superior demands of federal constitutional interests, as for example those protected by the First Amendment.

 Turning now to the case at bar, we consider whether the possibly private facts complained of here—broadly speaking, Ruth's appearance and words during the rescue and evacuation—were of legitimate public interest. If so, summary judgment was properly entered. "[B]ecause unnecessarily protracted litigation would have a chilling effect upon the exercise of First Amendment rights, speedy resolution of cases involving free speech is desirable. [Citation.] Therefore, summary judgment is a favored remedy [in such cases] . . . ." (*Good Government Group of Seal Beach, Inc.* v. *Superior Court* (1978) 22 Cal.3d 672, 685 [150 Cal.Rptr. 258, 586 P.2d 572]; see also *Haynes* v. *Alfred A. Knopf, Inc.*, *supra*, 8 F.3d at p. 1234 [Affirming summary judgment for defendants in private facts case: "To any suggestion that the outer bounds of liability should be left to a jury to decide we reply that in cases involving the rights protected by the speech and press clauses of the First Amendment the courts insist on judicial control of the jury."].) Nonetheless, the basic question raised on a defense motion for summary judgment, and on review of such judgment, is the same in a privacy action against media defendants as in other cases: Does the motion record demonstrate the existence of triable issues of fact, or was the defense entitled to judgment as a matter of law? (Code Civ. Proc., § 437c, subd. (c); *Sipple* v. *Chronicle Publishing Co.*, *supra*, 54 Cal.App.3d at p. 1046.)

 We agree at the outset with defendants that the subject matter of the broadcast as a whole was of legitimate public concern. Automobile accidents are by their nature of interest to that great portion of the public that travels frequently by automobile. The rescue and medical treatment of accident victims is also of legitimate concern to much of the public, involving as it does a critical service that any member of the public may someday need. The story of Ruth's difficult extrication from the crushed car, the medical attention given her at the scene, and her evacuation by helicopter was of particular interest because it highlighted some of the challenges facing emergency workers dealing with serious accidents.

The more difficult question is whether Ruth's appearance and words as she was extricated from the overturned car, placed in the helicopter and transported to the hospital were of legitimate public concern. Pursuant to the analysis outlined earlier, we conclude the disputed material was newsworthy as a matter of law. One of the dramatic and interesting aspects of the story as a whole is its focus on flight nurse Carnahan, who appears to be in charge of communications with other emergency workers, the hospital base and Ruth,

and who leads the medical assistance to Ruth at the scene. Her work is portrayed as demanding and important and as involving a measure of personal risk (e.g., in crawling under the car to aid Ruth despite warnings that gasoline may be dripping from the car).[10] The broadcast segment makes apparent that this type of emergency care requires not only medical knowledge, concentration and courage, but an ability to talk and listen to severely traumatized patients. One of the challenges Carnahan faces in assisting Ruth is the confusion, pain and fear that Ruth understandably feels in the aftermath of the accident. For that reason the broadcast video depicting Ruth's injured physical state (which was not luridly shown) and audio showing her disorientation and despair were substantially relevant to the segment's newsworthy subject matter.

Plaintiffs argue that showing Ruth's "intimate private, medical facts and her suffering was not *necessary* to enable the public to understand the significance of the accident or the rescue as a public event." The standard, however, is not necessity. That the broadcast *could* have been edited to exclude some of Ruth's words and images and still excite a minimum degree of viewer interest is not determinative. Nor is the possibility that the members of this or another court, or a jury, might find a differently edited broadcast more to their taste or even more interesting. The courts do not, and constitutionally could not, sit as superior editors of the press. (*Ross* v. *Midwest Communications, Inc., supra*, 870 F.2d at p. 275 ["Exuberant judicial blue-penciling after-the-fact would blunt the quills of even the most honorable journalists."]; *Gilbert, supra*, 665 F.2d at p. 308 [Liability for disclosure of private facts is limited "to the extreme case, thereby providing the breathing space needed by the press to properly exercise effective editorial judgment."].)

The challenged material was thus substantially relevant to the newsworthy subject matter of the broadcast and did not constitute a "morbid and sensational prying into private lives *for its own sake*." (Rest.2d Torts, § 652D, com. h, p. 391, italics added.) Nor can we say the broadcast material was so lurid and sensational in emotional tone, or so intensely personal in content, as to make its intrusiveness disproportionate to its relevance. Under these circumstances, the material was, as a matter of law, of legitimate public concern. Summary judgment was therefore properly entered against Ruth on

---

[10]Plaintiffs dispute whether there was any such fuel leak. It is undisputed, however, that during the broadcast segment a firefighter or paramedic tells Carnahan there is leaking gasoline, and she nevertheless crawls under the car to minister to Ruth.

her cause of action for publication of private facts.[11] As to Wayne, he is glimpsed only fleetingly in the broadcast video and is never heard. The broadcast includes no images or information regarding him that could be offensive to a reasonable person of ordinary sensibilities. Summary judgment was therefore also proper on Wayne's cause of action for publication of private facts.

One might argue that, while the contents of the broadcast were of legitimate interest in that they reflected on the nature and quality of emergency rescue services, the images and sounds that potentially allowed identification of Ruth as the accident victim were irrelevant and of no legitimate public interest in a broadcast that aired some months after the accident and had little or no value as "hot" news. (See *Briscoe, supra,* 4 Cal.3d at p. 537 [While reports of the facts of "long past" crimes are newsworthy, identification of the actor in such crimes "usually serves little independent public purpose."].) We do not take that view. It is difficult to see how the subject broadcast could have been edited to avoid completely any possible identification without severely undercutting its legitimate descriptive and narrative impact. As broadcast, the segment included neither Ruth's full name nor direct display of her face. She was nonetheless arguably identifiable by her first name (used in recorded dialogue), her voice, her general appearance and the recounted circumstances of the accident (which, as noted, had previously been published, with Ruth's full name and city of residence, in a newspaper).[12] In a video documentary of this type, however, the use of that degree of truthful detail would seem not only relevant, but essential to the narrative.

## II. *Intrusion*

■ Of the four privacy torts identified by Prosser, the tort of intrusion into private places, conversations or matter is perhaps the one that best captures the common understanding of an "invasion of privacy." It encompasses unconsented-to physical intrusion into the home, hospital room or

---

[11]The United States Supreme Court has expressly reserved the question whether the government, in cases where information has been acquired *unlawfully* by a newspaper or by a source, may ever punish not only the unlawful acquisition, but the ensuing publication as well. (*Florida Star, supra,* 491 U.S. at pp. 533-536 [109 S.Ct. at pp. 2609-2611].) We do not decide that question in the present case, regarding it as going to the extent of allowable damages for intrusion. (See fn. 18, *post.*)

[12]Although *complete* lack of identification or identifiability would seemingly defeat a private facts claim, as there could be no injury, an invasion of privacy does not necessarily depend on whether the plaintiff's full name was broadcast or whether she was identifiable to *all* viewers. (See *Haynes* v. *Alfred A. Knopf, Inc., supra,* 8 F.3d at p. 1233 [Even if plaintiffs' names had been changed in nonfiction book, factual details would have identified them "to anyone who has known [them] well for a long time (members of their families, for example), or who knew them before they got married; and no more is required for liability either in defamation law [citations] or in privacy law. [Citations.]"].)

other place the privacy of which is legally recognized, as well as unwarranted sensory intrusions such as eavesdropping, wiretapping, and visual or photographic spying. (See Rest.2d Torts, § 652B, com. b., pp. 378-379, and illustrations.) It is in the intrusion cases that invasion of privacy is most clearly seen as an affront to individual dignity. "[A] measure of personal isolation and personal control over the conditions of its abandonment is of the very essence of personal freedom and dignity, is part of what our culture means by these concepts. A man whose home may be entered at the will of another, whose conversations may be overheard at the will of another, whose marital and familial intimacies may be overseen at the will of another, is less of a man, has less human dignity, on that account. He who may intrude upon another at will is the master of the other and, in fact, intrusion is a primary weapon of the tyrant." (Bloustein, *Privacy as an Aspect of Human Dignity: An Answer to Dean Prosser* (1964) 39 N.Y.U. L.Rev. 962, 973-974, fn. omitted.)

Despite its conceptual centrality, the intrusion tort has received less judicial attention than the private facts tort, and its parameters are less clearly defined. The leading California decision is *Miller* v. *National Broadcasting Co., supra*, 187 Cal.App.3d 1463 (*Miller*). *Miller*, which like the present case involved a news organization's videotaping the work of emergency medical personnel, adopted the Restatement's formulation of the cause of action: "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." (Rest.2d Torts, § 652B; *Miller, supra*, 187 Cal.App.3d at p. 1482.)

As stated in *Miller* and the Restatement, therefore, the action for intrusion has two elements: (1) intrusion into a private place, conversation or matter, (2) in a manner highly offensive to a reasonable person. We consider the elements in that order.

We ask first whether defendants "intentionally intrude[d], physically or otherwise, upon the solitude or seclusion of another," that is, into a place or conversation private to Wayne or Ruth. (Rest.2d Torts, § 652B; *Miller, supra*, 187 Cal.App.3d at p. 1482.) "[T]here is no liability for the examination of a public record concerning the plaintiff, . . . [or] for observing him or even taking his photograph while he is walking on the public highway . . . ." (Rest.2d Torts, § 652B, com. c., pp. 379-380; see, e.g., *Aisenson* v. *American Broadcasting Co.* (1990) 220 Cal.App.3d 146, 162-163 [269 Cal.Rptr. 379] [where judge who was subject of news story was filmed from

public street as he walked from his home to his car, any invasion of privacy was "extremely de minimis"]; see also 1 McCarthy, The Rights of Publicity and Privacy (1997) § 5.10[A][2], pp. 5-111 to 5-113 [collecting cases].) To prove actionable intrusion, the plaintiff must show the defendant penetrated some zone of physical or sensory privacy surrounding, or obtained unwanted access to data about, the plaintiff. The tort is proven only if the plaintiff had an objectively reasonable expectation of seclusion or solitude in the place, conversation or data source. (Rest.2d Torts, § 652B, com. c., p. 379; see, e.g., *PETA* v. *Bobby Berosini, Ltd.* (1995) 111 Nev. 615 [895 P.2d 1269, 1280-1281] [plaintiff animal trainer had no expectation of seclusion or solitude in backstage preparation area]; *Frankel* v. *Warwick Hotel* (E.D.Pa. 1995) 881 F.Supp. 183, 188 [father's meddling in son's marriage not intrusion where there was no "physical or sensory penetration of a person's zone of seclusion"].)

■■■ Cameraman Cooke's mere presence at the accident scene and filming of the events occurring there cannot be deemed either a physical or sensory intrusion on plaintiffs' seclusion. Plaintiffs had no right of ownership or possession of the property where the rescue took place, nor any actual control of the premises. Nor could they have had a reasonable expectation that members of the media would be excluded or prevented from photographing the scene; for journalists to attend and record the scenes of accidents and rescues is in no way unusual or unexpected. (Cf. Pen. Code, §§ 409.5, subd. (d), 409.6, subd. (d) [exempting press representatives from certain emergency closure orders].)

■■■ Two aspects of defendants' conduct, however, raise triable issues of intrusion on seclusion. First, a triable issue exists as to whether both plaintiffs had an objectively reasonable expectation of privacy in the interior of the rescue helicopter, which served as an ambulance. Although the attendance of reporters and photographers at the scene of an accident is to be expected, we are aware of no law or custom permitting the press to ride in ambulances or enter hospital rooms during treatment without the patient's consent. (See *Noble* v. *Sears, Roebuck & Co., supra,* 33 Cal.App.3d at p. 660 [accepting, subject to proof at trial, intrusion plaintiff's theory she had "an exclusive right of occupancy of her hospital room" as against investigator]; *Miller, supra,* 187 Cal.App.3d at pp. 1489-1490 [Rejecting intrusion defendant's claim that plaintiff consented to media's entry into home by calling paramedics: "One seeking emergency medical attention does not thereby 'open the door' for persons without any clearly identifiable and justifiable official reason who may wish to enter the premises where the medical aid is being administered."].) Other than the two patients and Cooke, only three

people were present in the helicopter, all Mercy Air staff. As the Court of Appeal observed, "[i]t is neither the custom nor the habit of our society that any member of the public at large or its media representatives may hitch a ride in an ambulance and ogle as paramedics care for an injured stranger." (See also *Green* v. *Chicago Tribune Co.*, *supra*, 675 N.E.2d at p. 252 [hospital room not public place]; *Barber* v. *Time, Inc.*, *supra*, 159 S.W.2d at p. 295 ["Certainly, if there is any right of privacy at all, it should include the right to obtain medical treatment at home or in a hospital . . . without personal publicity."].)

■ Second, Ruth was entitled to a degree of privacy in her conversations with Carnahan and other medical rescuers at the accident scene, and in Carnahan's conversations conveying medical information regarding Ruth to the hospital base. Cooke, perhaps, did not intrude into that zone of privacy merely by being present at a place where he could hear such conversations with unaided ears. But by placing a microphone on Carnahan's person, amplifying and recording what she said and heard, defendants may have listened in on conversations the parties could reasonably have expected to be private.

The Court of Appeal held plaintiffs had no reasonable expectation of privacy at the accident scene itself because the scene was within the sight and hearing of members of the public. The summary judgment record, however, does not support the Court of Appeal's conclusion; instead, it reflects, at the least, the existence of triable issues as to the privacy of certain conversations at the accident scene, as in the helicopter. The videotapes (broadcast and raw footage) show the rescue did not take place "on a heavily traveled highway," as the Court of Appeal stated, but in a ditch many yards from and below the rural superhighway, which is raised somewhat at that point to bridge a nearby crossroad. From the tapes it appears unlikely the plaintiffs' extrication from their car and medical treatment at the scene could have been observed by any persons who, in the lower court's words, "passed by" on the roadway. Even more unlikely is that any passersby on the road could have heard Ruth's conversation with Nurse Carnahan or the other rescuers.[13]

Whether Ruth expected her conversations with Nurse Carnahan or the other rescuers to remain private and whether any such expectation was

[13]Nor are we able to discern on the tapes any "crowd of onlookers peering down at the rescue scene," as did the Court of Appeal. In the broadcast segment, when the helicopter lands at the accident scene, the camera, from a distance, captures three or four people standing on the edge of the highway, looking in the direction of the accident scene. Whether these people are connected to the rescue effort (emergency vehicles are parked on the highway shoulder near them) or what they are able to see from their vantage point (the overturned vehicle is about 50 feet from, and well below, the highway, with a number of trees in between) is

reasonable are, on the state of the record before us, questions for the jury. We note, however, that several existing legal protections for communications could support the conclusion that Ruth possessed a reasonable expectation of privacy in her conversations with Nurse Carnahan and the other rescuers. A patient's conversation with a provider of medical care in the course of treatment, including emergency treatment, carries a traditional and legally well-established expectation of privacy. (See Evid. Code, §§ 990-1007 [physician-patient privilege]; Civ. Code, §§ 56-56.37 [Confidentiality of Medical Information Act].)[14] Moreover, California's Invasion of Privacy Act (Pen. Code, §§ 630-637.6; see *Ribas* v. *Clark* (1985) 38 Cal.3d 355, 359 [212 Cal.Rptr. 143, 696 P.2d 637, 49 A.L.R.4th 417] (*Ribas*)) prohibits the recording of any "confidential communication" without the consent of all parties thereto. (Pen. Code, § 632, subd. (a).)

A confidential communication, for purposes of Penal Code section 632 (hereafter section 632), need not fall within an evidentiary privilege. Rather, the term includes "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering . . . or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded." (§ 632, subd. (c).) The Invasion of Privacy Act, as we explained in *Ribas*, provides legal recognition of the individual's reasonable expectation of privacy against unauthorized interception and recording of confidential conversations: "While one who imparts private information

---

unclear. On the tape of raw footage, Cooke at one point climbs the embankment and films from the shoulder in the direction of the rescue scene. The car is not visible from that vantage point; it comes into view only as Cooke, still filming, descends the embankment.

As to those gathered at the rescue site itself, it is unclear from the record, and therefore unripe for decision on summary judgment, whether any of those present—other than cameraman Cooke—were mere spectators. Most were clearly law enforcement personnel, firefighters or paramedics. A few individuals shown on tape are not in uniform, but at times during Ruth's and Wayne's extrication even some of these persons are seen assisting the rescuers, for example by holding an intravenous fluids bottle. Finally, it is unclear from the tapes if anyone other than those involved was able to hear Ruth's conversation with the nurse and paramedics.

Both parties have briefed the correctness of the Court of Appeal's assessment of the accident scene's privacy, although defendants also contend this issue is not within the original scope of our review (Cal. Rules of Court, rule 29.3(c)). Whether or not defendants are correct that this question was not reasonably comprehended in the issues raised in the petition for review, we have found it necessary to address this point in order to state and decide fairly and accurately the legal questions inherent in the case. (Cal. Rules of Court, rule 29.2(a).)

[14]We need not determine whether any violation of the Confidentiality of Medical Information Act occurred here. Mercy Air's liability for such a violation is no longer at issue, and plaintiffs did not plead any such violation by the media defendants. On remand, however, the question whether the defendants acted in concert with Mercy Air to illegally reveal confidential medical information may be relevant to plaintiffs' intrusion claim.

risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or a mechanical device. (*Warden* v. *Kahn* [(1979)] 99 Cal.App.3d 805, 813-814 [160 Cal.Rptr. 471].) [¶] . . . [S]uch secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements." (*Ribas, supra,* 38 Cal.3d at pp. 360-361.)[15]

Ruth's claim, of course, does not require her to prove a statutory violation, only to prove that she had an objectively reasonable expectation of privacy in her conversations. ■■■ Whether the circumstances of Ruth's extrication and helicopter rescue would reasonably have indicated to defendants, or to their agent, Cooke, that Ruth would desire and expect her communications to Carnahan and the other rescuers to be confined to them alone, and therefore not to be electronically transmitted and recorded, is a triable issue of fact in this case. As observed earlier, whether anyone present (other than Cooke) was a mere observer, uninvolved in the rescue effort, is unclear from the summary judgment record. Also unclear is who, if anyone, could overhear conversations between Ruth and Carnahan, which were transmitted by a microphone on Carnahan's person, amplified and recorded by defendants. We cannot say, as a matter of law, that Cooke should not have perceived he might be intruding on a confidential communication when he recorded a seriously injured patient's conversations with medical personnel.[16]

---

[15]Neither in *Ribas* nor in any other case have we had occasion to decide whether a communication may be deemed confidential under Penal Code section 632, subdivision (c) when a party reasonably expects and desires that the conversation itself will not be directly overheard by a nonparticipant or recorded by any person, participant or nonparticipant, but does not reasonably expect that the contents of the communication will remain confidential to the parties. (Compare *Coulter* v. *Bank of America* (1994) 28 Cal.App.4th 923, 929 [33 Cal.Rptr.2d 766] and *Frio* v. *Superior Court* (1988) 203 Cal.App.3d 1480, 1488-1490 [250 Cal.Rptr. 819] [both holding section 632 requires only that a party to the conversation reasonably expects it to be private from recording or eavesdropping] with *O'Laskey* v. *Sortino* (1990) 224 Cal.App.3d 241, 248 [273 Cal.Rptr. 674] [referring to expectation the conversation would not be "divulged" to third party] and *Deteresa* v. *American Broadcasting Companies, Inc.* (9th Cir. 1997) 121 F.3d 460, 463-464 [reading *O'Laskey* v. *Sortino, supra,* as requiring expectation of secrecy of contents and predicting this court would adopt such interpretation of section 632].) We need not resolve that issue here, because under either interpretation of section 632, subdivision (c) triable issues exist whether Ruth had a reasonable expectation of privacy in her communications to medical personnel.

[16]The trial court denied, on grounds of delay, plaintiffs' request to amend their complaint to allege a violation of section 632. The Court of Appeal affirmed the ruling and, as plaintiffs did not petition for review of that decision, its merits are not before us. As the Court of Appeal observed, however, Ruth's contention Cooke illegally recorded her conversations with Carnahan is comprehended in the complaint's claim of intrusion and the substantive law relating to that claim.

We turn to the second element of the intrusion tort, offensiveness of the intrusion. In a widely followed passage, the *Miller* court explained that determining offensiveness requires consideration of all the circumstances of the intrusion, including its degree and setting and the intruder's "motives and objectives." (*Miller, supra,* 187 Cal.App.3d at pp. 1483-1484; cited, e.g., in *Hill, supra,* 7 Cal.4th at p. 26; *Sacramento County Deputy Sheriffs' Assn.* v. *County of Sacramento* (1996) 51 Cal.App.4th 1468, 1487 [59 Cal.Rptr.2d 834]; *Magenis* v. *Fisher Broadcasting, Inc.* (1990) 103 Or.App. 555 [798 P.2d 1106, 1110]; and *PETA* v. *Bobby Berosini, Ltd., supra,* 895 P.2d at p. 1282.) The *Miller* court concluded that reasonable people could regard the camera crew's conduct in filming a man's emergency medical treatment in his home, without seeking or obtaining his or his wife's consent, as showing "a cavalier disregard for ordinary citizens' rights of privacy" and, hence, as highly offensive. (*Miller, supra,* 187 Cal.App.3d at p. 1484.)

We agree with the *Miller* court that all the circumstances of an intrusion, including the motives or justification of the intruder, are pertinent to the offensiveness element.[17] Motivation or justification becomes particularly important when the intrusion is by a member of the print or broadcast press in the pursuit of news material. Although, as will be discussed more fully later, the First Amendment does not immunize the press from liability for torts or crimes committed in an effort to gather news (*Cohen* v. *Cowles Media Co.* (1991) 501 U.S. 663, 669 [111 S.Ct. 2513, 2518, 115 L.Ed.2d 586]; *Dietemann* v. *Time, Inc.* (9th Cir. 1971) 449 F.2d 245, 249 (*Dietemann*); *Miller, supra,* 187 Cal.App.3d at p. 1492), the constitutional protection of the press does reflect the strong societal interest in effective and complete reporting of events, an interest that may—as a matter of tort law—justify an intrusion that would otherwise be considered offensive. While refusing to recognize a broad privilege in newsgathering against application of generally applicable laws, the United States Supreme Court has also observed that "without some protection for seeking out the news, freedom of the press could be eviscerated." (*Branzburg* v. *Hayes* (1972) 408 U.S. 665, 681 [92 S.Ct. 2646, 2656, 33 L.Ed.2d 626]; see also *Nicholson* v. *McClatchy Newspapers* (1986) 177 Cal.App.3d 509, 519-520 [223 Cal.Rptr. 58].)

In deciding, therefore, whether a reporter's alleged intrusion into private matters (i.e., physical space, conversation or data) is "offensive" and hence actionable as an invasion of privacy, courts must consider the extent to which the intrusion was, under the circumstances, justified by the legitimate

---

[17]Among other factors, an intrusion may be deemed more offensive to the extent the intruder's behavior created a risk that the target's efforts to evade or resist the intrusion would lead to physical harm to the intruder, the target or others.

motive of gathering the news. Information-collecting techniques that may be highly offensive when done for socially unprotected reasons—for purposes of harassment, blackmail or prurient curiosity, for example—may not be offensive to a reasonable person when employed by journalists in pursuit of a socially or politically important story. Thus, for example, "a continuous surveillance which is tortious when practiced by a creditor upon a debtor may not be tortious when practiced by media representatives in a situation where there is significant public interest [in discovery of the information sought]." (Hill, *Defamation and Privacy Under the First Amendment* (1976) 76 Colum. L.Rev. 1205, 1284, fn. omitted.)

The mere fact the intruder was in pursuit of a "story" does not, however, generally justify an otherwise offensive intrusion; offensiveness depends as well on the particular method of investigation used. At one extreme, " 'routine . . . reporting techniques,' " such as asking questions of people with information ("including those with confidential or restricted information") could rarely, if ever, be deemed an actionable intrusion. (*Nicholson* v. *McClatchy Newspapers*, *supra*, 177 Cal.App.3d at p. 519; accord, *Wolfson* v. *Lewis* (E.D.Pa. 1996) 924 F.Supp. 1413, 1417.) At the other extreme, violation of well-established legal areas of physical or sensory privacy— trespass into a home or tapping a personal telephone line, for example— could rarely, if ever, be justified by a reporter's need to get the story. Such acts would be deemed highly offensive even if the information sought was of weighty public concern; they would also be outside any protection the Constitution provides to newsgathering. (*Cohen* v. *Cowles Media Co.*, *supra*, 501 U.S. at p. 669 [111 S.Ct. at p. 2518]; *Dietemann*, *supra*, 449 F.2d at p. 249.)

Between these extremes lie difficult cases, many involving the use of photographic and electronic recording equipment. Equipment such as hidden cameras and miniature cordless and directional microphones are powerful investigative tools for newsgathering, but may also be used in ways that severely threaten personal privacy. California tort law provides no bright line on this question; each case must be taken on its facts.

On this summary judgment record, we believe a jury could find defendants' recording of Ruth's communications to Carnahan and other rescuers, and filming in the air ambulance, to be " 'highly offensive to a reasonable person.' " (*Miller*, *supra*, 187 Cal.App.3d at p. 1482, italics omitted.) With regard to the depth of the intrusion (*id.* at p. 1483), a reasonable jury could find highly offensive the placement of a microphone on a medical rescuer in order to intercept what would otherwise be private conversations with an injured patient. In that setting, as defendants could and

should have foreseen, the patient would not know her words were being recorded and would not have occasion to ask about, and object or consent to, recording. Defendants, it could reasonably be said, took calculated advantage of the patient's "vulnerability and confusion." (*Id.* at p. 1484.) Arguably, the last thing an injured accident victim should have to worry about while being pried from her wrecked car is that a television producer may be recording everything she says to medical personnel for the possible edification and entertainment of casual television viewers.

For much the same reason, a jury could reasonably regard entering and riding in an ambulance—whether on the ground or in the air—with two seriously injured patients to be an egregious intrusion on a place of expected seclusion. Again, the patients, at least in this case, were hardly in a position to keep careful watch on who was riding with them, or to inquire as to everyone's business and consent or object to their presence. A jury could reasonably believe that fundamental respect for human dignity requires the patients' anxious journey be taken only with those whose care is solely for them and out of sight of the prying eyes (or cameras) of others.

Nor can we say as a matter of law that defendants' motive—to gather usable material for a potentially newsworthy story—necessarily privileged their intrusive conduct as a matter of common law tort liability. A reasonable jury could conclude the producers' desire to get footage that would convey the "feel" of the event—the real sights and sounds of a difficult rescue—did not justify either placing a microphone on Nurse Carnahan or filming inside the rescue helicopter. Although defendants' purposes could scarcely be regarded as evil or malicious (in the colloquial sense), their behavior could, even in light of their motives, be thought to show a highly offensive lack of sensitivity and respect for plaintiffs' privacy. (*Miller, supra,* 187 Cal.App.3d at p. 1484.) A reasonable jury could find that defendants, in placing a microphone on an emergency treatment nurse and recording her conversation with a distressed, disoriented and severely injured patient, without the patient's knowledge or consent, acted with highly offensive disrespect for the patient's personal privacy comparable to, if not quite as extreme as, the disrespect and insensitivity demonstrated in *Miller.*

■■■■ Turning to the question of constitutional protection for newsgathering, one finds the decisional law reflects a general rule of *nonprotection*: the press in its newsgathering activities enjoys no immunity or exemption from generally applicable laws. (*Cohen v. Cowles Media Co., supra,* 501 U.S. at pp. 669-670 [111 S.Ct. at pp. 2518-2519]; see *Branzburg v. Hayes, supra,* 408 U.S. at pp. 680-695 [92 S.Ct. at pp. 2656-2664] [extensive discussion, concluding press enjoys no special immunity from questioning

regarding sources with information on criminal activities under investigation by grand jury]; *Pell* v. *Procunier* (1974) 417 U.S. 817, 832-835 [94 S.Ct. 2800, 2809-2810, 41 L.Ed.2d 495] [no special right of access to state prisoners for interviews]; *Dietemann, supra,* 449 F.2d at p. 249 [First Amendment is not a license for electronic intrusion; investigative journalism can be successfully practiced without secret recording]; *Shevin* v. *Sunbeam Television Corp.* (Fla. 1977) 351 So.2d 723, 725-727 [under *Branzburg, Pell,* and *Dietemann,* Florida statute prohibiting nonconsensual recording of private conversations may constitutionally be applied to news reporters].)

"It is clear that the First Amendment does not invalidate every incidental burdening of the press that may result from the enforcement of civil and criminal statutes of general applicability. Under prior cases, otherwise valid laws serving substantial public interests may be enforced against the press as against others, despite the possible burden that may be imposed." (*Branzburg* v. *Hayes, supra,* 408 U.S. at pp. 682-683 [92 S.Ct. at p. 2657].) California's intrusion tort and section 632 are both laws of general applicability. They apply to all private investigative activity, whatever its purpose and whoever the investigator, and impose no greater restrictions on the media than on anyone else. (If anything, the media enjoy some degree of *favorable* treatment under the California intrusion tort, as a reporter's motive to discover socially important information may reduce the offensiveness of the intrusion.) These laws serve the undisputedly substantial public interest in allowing each person to maintain an area of physical and sensory privacy in which to live. ■■■ Thus, defendants enjoyed no constitutional privilege, merely by virtue of their status as members of the news media, to eavesdrop in violation of section 632 or otherwise to intrude tortiously on private places, conversations or information.

■■■ Courts have impliedly recognized that a generally applicable law might, under some circumstances, impose an "impermissible burden" on newsgathering (*Miller, supra,* 187 Cal.App.3d at p. 1493); such a burden might be found in a law that, as applied to the press, would result in "a significant constriction of the flow of news to the public" and thus "eviscerate[]" the freedom of the press. (*Branzburg* v. *Hayes, supra,* 408 U.S. at pp. 693, 681 [92 S.Ct. at pp. 2663, 2656-2657].) No basis exists, however, for concluding that either section 632 or the intrusion tort places such a burden on the press, either in general or under the circumstances of this case. The conduct of journalism does not depend, as a general matter, on the use of secret devices to record private conversations. (Accord, *Dietemann, supra,* 449 F.2d at p. 249 ["We strongly disagree . . . that hidden mechanical contrivances are 'indispensable tools' of newsgathering. Investigative reporting is an ancient art; its successful practice long antecedes the invention of

miniature cameras and electronic devices."]; *Shevin* v. *Sunbeam Television Corp., supra,* 351 So.2d at p. 727 ["News gathering is an integral part of news dissemination, but hidden mechanical contrivances are not indispensable tools of news gathering."].) More specifically, nothing in the record or briefing here suggests that reporting on automobile accidents and medical rescue activities depends on secretly recording accident victims' conversations with rescue personnel or on filming inside an occupied ambulance. Thus, if any exception exists to the general rule that "the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally" (*Branzburg* v. *Hayes, supra,* 408 U.S. at p. 684 [92 S.Ct. at p. 2658]), such exception is inapplicable here.[18]

As should be apparent from the above discussion, the constitutional protection accorded newsgathering, if any, is far narrower than the protection surrounding the publication of truthful material; consequently, the fact that a reporter may be seeking "newsworthy" material does not in itself privilege the investigatory activity. The reason for the difference is simple: The intrusion tort, unlike that for publication of private facts, does not subject the press to liability for the contents of its publications. Newsworthiness, as we stated earlier, is a complete bar to liability for publication of private facts and is evaluated with a high degree of deference to editorial judgment. The same deference is not due, however, when the issue is not the media's right to publish or broadcast what they choose, but their right to intrude into secluded areas or conversations in pursuit of publishable material. At most, the Constitution may preclude tort liability that would "place an impermissible burden on newsgatherers" (*Miller, supra,* 187 Cal.App.3d at p. 1493) by depriving them of their " 'indispensable tools' " (*Dietemann, supra,* 449 F.2d at p. 249).

Defendants urge a rule more protective of press investigative activity. Specifically, they seek a holding that "when intrusion claims are brought in the context of newsgathering conduct, that conduct be deemed protected so long as (1) the information being gathered is about a matter of legitimate concern to the public and (2) the underlying conduct is lawful (i.e., was undertaken without fraud, trespass, etc.)." Neither tort law nor constitutional precedent and policy support such a broad privilege. *Miller, Dietemann,* and

---

[18]Defendants urge us to hold that any damages for intrusion do not include compensation for injury resulting from the publication of material gathered through intrusion. The only intrusion case defendants cite on this point is against them. (*Dietemann, supra,* 449 F.2d at pp. 249-250 [allowing publication damages in intrusion case]; see generally, Hill, *Defamation and Privacy Under the First Amendment, supra,* 76 Colum. L.Rev. at pp. 1281-1286 [discussing various approaches].) We do not reach the question, as the measure of plaintiffs' damages is not before us on this appeal from summary judgment in favor of the defense.

*Wolfson* v. *Lewis, supra,* 924 F.Supp. 1413, were all cases in which the reporters and photographers were acting in pursuit of newsworthy material, but were held to have tortiously intruded on the plaintiffs' privacy because their conduct was highly offensive to a reasonable person, not because they had committed any independent crime or tort.[19] (See also *Baugh* v. *CBS, Inc.* (N.D.Cal. 1993) 828 F.Supp. 745, 757 [intrusion tort does not require existence of technical trespass]; *KOVR-TV, Inc.* v. *Superior Court* (1995) 31 Cal.App.4th 1023, 1030-1032 [37 Cal.Rptr.2d 431] [no newsgathering defense to claim of intentional infliction of emotional harm for television reporter's telling small children their neighbors had been killed while filming their shocked reaction, even if reporter hoped the children's reaction would be " 'newsworthy,' e.g., suitable to redeem a promise of 'film at eleven' "]; Rest.2d Torts, § 652B, illus. 1, p. 379 ["A, a woman, is sick in a hospital room with a rare disease that arouses public curiosity. B, a newspaper reporter, calls her on the telephone and asks for an interview, but she refuses to see him. B then goes to the hospital, enters A's room and over her objection takes her photograph. B has invaded A's privacy."].)

As to constitutional policy, we repeat that the threat of infringement on the liberties of the press from intrusion liability is minor compared with the threat from liability for publication of private facts. Indeed, the distinction led one influential commentator to assert flatly that "[i]ntrusion does not raise first amendment difficulties since its perpetration does not involve speech or other expression." (Nimmer, *supra,* 56 Cal.L.Rev. at p. 957.) Such a broad statement is probably not warranted; a liability rule, for example, that punished as intrusive a reporter's merely asking questions about matters

---

[19]In *Miller* the camera crew's entry into the Miller home was also deemed a trespass (*Miller, supra,* 187 Cal.App.3d at p. 1480), but the court's discussion of the intrusion tort does not depend on this fact. (*Id.* at pp. 1482-1484.)

In *Dietemann, supra,* 449 F.2d 245, reporters for Life Magazine gained consensual access to the home office of a quack doctor, where they secretly photographed him and recorded his remarks as he purportedly diagnosed a medical condition of one of the reporters. (449 F.2d at p. 246.) The federal court, applying California law, concluded the facts showed an invasion of privacy. (*Id.* at pp. 247-249.) Presumably because a peaceable entry by consent does not constitute trespass under California law (see 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 607, p. 706), no question of liability for trespass arose in *Dietemann.*

In *Wolfson* v. *Lewis, supra,* 924 F.Supp. 1413, television reporters doing a story on the high salaries paid to executives of health care companies physically pursued a family that included three such executives in an effort to get "ambush" interviews with them, and attempted to intercept with a directional microphone conversations they had at a family home. The federal district court granted preliminary injunctive relief against such behavior, finding the plaintiffs likely to prevail on their claim the reporters' harassment and spying was a highly offensive intrusion into their privacy. (*Id.* at pp. 1432-1434.) The court expressly stated its finding of a tortious intrusion was not based on any alleged trespass. (*Id.* at p. 1434.) Nor was the court's finding of a tortious intrusion logically dependent on violation of state anti-eavesdropping statutes, although two such statutes were cited in support of the privacy element of the intrusion tort (in the same manner as we have cited section 632). (924 F.Supp. at p. 1434.)

an organization or person did not choose to publicize would likely be deemed an impermissible restriction on press freedom. But no constitutional precedent or principle of which we are aware gives a reporter general license to intrude in an objectively offensive manner into private places, conversations or matters merely because the reporter thinks he or she may thereby find something that will warrant publication or broadcast.

## CONCLUSION

The claim of these accident victims that their privacy was invaded by the production and broadcast of a documentary segment on their rescue raises questions about how the news media obtain their material (the intrusion claim), as well as about what they choose to publish or broadcast (the publication of private facts claim). Largely for constitutional reasons, the paths we have taken in analyzing these two privacy claims have diverged and led to different results.

The broadcast details of Ruth's rescue of which she complains were, as a matter of law, of legitimate public concern because they were substantially relevant to the newsworthy subject of the piece and their intrusiveness was not greatly disproportionate to their relevance. That analytical path is dictated by the danger of the contrary approach; to allow liability because this court, or a jury, believes certain details of the story as broadcast were not important or necessary to the purpose of the documentary, or were in poor taste or overly sensational in impact, would be to assert impermissible supervisory power over the press.

The intrusion claim calls for a much less deferential analysis. In contrast to the broad privilege the press enjoys for publishing truthful, newsworthy information in its possession, the press has *no* recognized constitutional privilege to violate generally applicable laws in pursuit of material. Nor, even absent an independent crime or tort, can a highly offensive intrusion into a private place, conversation, or source of information generally be justified by the plea that the intruder hoped thereby to get good material for a news story. Such a justification *may* be available when enforcement of the tort or other law would place an impermissibly severe burden on the press, but that condition is not met in this case.

In short, the state may not intrude into the proper sphere of the news media to dictate what they should publish and broadcast, but neither may the media play tyrant to the people by unlawfully spying on them in the name of newsgathering. Summary judgment for the defense was proper as to plaintiffs' cause of action for publication of private facts (the second cause of

action), but improper as to the cause of action for invasion of privacy by intrusion (the first cause of action).

## DISPOSITION

The judgment of the Court of Appeal is affirmed except insofar as the Court of Appeal reversed and remanded for further proceedings on Ruth Shulman's cause of action for publication of private facts.

George, C. J., and Kennard, J., concurred.

**KENNARD, J.,** Concurring.—Applying existing California tort law, the plurality opinion holds that to establish a cause of action for invasion of privacy by publication of private facts the plaintiff must show that a private fact was publicly disclosed, that the disclosure would be offensive and objectionable to a reasonable person, and that the private fact was not newsworthy. I agree that here summary judgment was properly entered against plaintiffs on that cause of action. There is, however, a tension between the plurality opinion's rule of liability for publication of private facts and some aspects of the United States Supreme Court's current First Amendment jurisprudence. In my view, the potential clash in this area of law between personal privacy interests and the First Amendment's guarantee of freedom of speech and of the press warrants a more detailed examination than the plurality opinion has undertaken.

Privacy is a fundamental constituent of human identity and of the communities we inhabit. (See Post, *The Social Foundations of Privacy: Community and Self in the Common Law Tort* (1989) 77 Cal. L.Rev. 957.) Preserving a sphere of private thought, speech, and action, and controlling who are to be let into that sphere and the conditions under which they may enter, is an essential part of human dignity and autonomy. We define ourselves by controlling what we disclose to the world and what we preserve from public view. In an earlier age, privacy was more easily maintained, for the social and physical barriers that protected it were either prohibitively costly or physically impossible to breach. Not so today, when the social and physical barriers that formerly protected our privacy are dissolving in the face of technological and economic changes. (*Loder* v. *City of Glendale* (1997) 14 Cal.4th 846, 921 [59 Cal.Rptr.2d 696, 927 P.2d 1200] (conc. & dis. opn. of Kennard, J.).) Personal information that previously could only have been gathered at great expense, or could not have been gathered at all, is now routinely collected, analyzed, packaged, and distributed instantaneously and at trivial cost. Our secrets, great or small, can now without our knowledge hurtle around the globe at the speed of light, preserved indefinitely for future

recall in the electronic limbo of computer memories. These technological and economic changes in turn have made legal barriers more essential to the preservation of our privacy.

The free flow of truthful information, however, is also a fundamental value of our society, embodied in the First Amendment to the federal Constitution. As the plurality opinion notes, the United States Supreme Court has not yet attempted to fashion a general rule striking a balance between our competing interests in preserving a sphere of personal privacy and in unfettered publication of truthful information. Because of the complexities of the problem, crafting a general rule in this area would not be an easy task. The authors of two prominent constitutional law treatises, for example, take opposite views on whether the First Amendment permits a cause of action for truthful publication of private facts. Professors Rotunda and Nowak would not allow the cause of action: "[I]n light of later constitutional cases, and given the general [First Amendment] rationale articulated by the Supreme Court over the years, the state should always recognize that truth is a defense in a defamation or right of privacy action . . . ." (4 Rotunda & Nowak, Treatise on Constitutional Law (2d ed. 1992) § 20.36, p. 231.) Professor Tribe, on the other hand, takes the view that the First Amendment permits the cause of action: "[W]hen government acts to limit the untrammeled gathering, recording, or dissemination of data or statements about an individual, of course it inhibits speech—but it also vindicates the individual's ability to control what others are told about his or her life. Such control constitutes a central part of the right to shape the 'self' that any individual presents to the world." (Tribe, American Constitutional Law (2d ed. 1988) § 12-14, p. 887.)

The plurality opinion tries to balance these two values by using the concept of newsworthiness to define a general limit on the scope of tort liability for disclosure of private facts; it acknowledges only a "theoretical risk" that the tort would intrude on expression protected by the First Amendment. (Plur. opn., *ante*, at p. 225, fn. 8.) I am not so sanguine.

The "newsworthiness" rule of liability may raise a number of concerns under at least some strains of the United States Supreme Court's current First Amendment doctrine. First, turning as it does on an inevitably subjective determination of whether the public's interest in a story is "legitimate" or "morbid," the "newsworthiness" rule suppresses truthful speech on the basis of its content—the central evil of censorship. Content-based restrictions on speech bear a heavy burden, for "the point of all speech protection . . . is to shield just those choices of content that in someone's eyes are misguided, or even hurtful." (*Hurley* v. *Irish-American Gay, Lesbian and*

*Bisexual Group of Boston, Inc.* (1995) 515 U.S. 557, 574 [115 S.Ct. 2338, 2347-2348, 132 L.Ed.2d 487].) As *Hurley* explains: "The very idea that a noncommercial speech restriction be used to produce thoughts and statements acceptable to some groups or, indeed, all people, grates on the First Amendment, for it amounts to nothing less than a proposal to limit speech in the service of orthodox expression. The Speech Clause has no more certain antithesis." (*Id.* at p. 579 [115 S.Ct. at p. 2350].) "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." (*Rosenberger* v. *Rector and Visitors of Univ. of Va.* (1995) 515 U.S. 819, 828 [115 S.Ct. 2510, 2516, 132 L.Ed.2d 700].) Accordingly, "[c]ontent-based regulations are presumptively invalid." (*R. A. V.* v. *St. Paul* (1992) 505 U.S. 377, 382 [112 S.Ct. 2538, 2542, 120 L.Ed.2d 305].)

To the extent the United States Supreme Court has permitted content-based speech restrictions, it has required that the restrictions be justified by a "compelling" state interest and be the least restrictive means for achieving that interest. (*First National Bank of Boston* v. *Bellotti* (1978) 435 U.S. 765, 786 [98 S.Ct. 1407, 1421, 55 L.Ed.2d 707].) Indeed, without deciding whether truthful speech about private facts may ever be punished, the high court has specifically held that "where a newspaper publishes truthful information [concerning private facts] which it has lawfully obtained, punishment may lawfully be imposed, *if at all,* only when narrowly tailored to a state interest of the highest order." (*The Florida Star* v. *B. J. F.* (1989) 491 U.S. 524, 541 [109 S.Ct. 2603, 2613, 105 L.Ed.2d 443], italics added.) The plurality opinion has not attempted to justify its liability rule by this test.

The individual or social harmfulness of speech with a particular content is rarely a justification for suppressing it. For example, in a decision summarily affirmed by the United States Supreme Court, the federal Seventh Circuit Court of Appeals struck down an Indianapolis ordinance banning constitutionally protected pornography that subordinated women because of the perceived harmfulness of such pornography, while permitting other constitutionally protected pornography. (*American Booksellers Ass'n., Inc.* v. *Hudnut* (7th Cir. 1985) 771 F.2d 323; affd., 475 U. S. 1001 [106 S.Ct. 1172, 89 L.Ed.2d 291] [mem. opn.].) It could be argued that the "publication of private facts" tort is similarly unconstitutional, because it punishes the publication of a certain class of private facts—those that are not newsworthy—based on its perceived harmfulness while permitting publication of the same private facts if they are newsworthy.

Also, if this tort is to withstand constitutional scrutiny we must apply it not only to the press, the focus of the plurality opinion's analysis, but also to

individuals who repeat the private facts of others in casual conversation. (The *Florida Star* v. *B. J. F., supra,* 491 U.S. 524, 540 [109 S.Ct. 2603, 2613] ["When a State attempts the extraordinary measure of punishing truthful publication in the name of privacy, it must demonstrate its commitment to advancing this interest by applying its prohibition evenhandedly, to the smalltime disseminator as well as the media giant."]; *id.* at p. 542 [109 S.Ct. at pp. 2613-2614] (conc. opn. of Scalia, J.) [ same].) Doing so could chill much private communication, a cost the plurality opinion does not discuss.

The tension between current First Amendment doctrine and the tort of publication of private facts is also reflected in the questionable constitutional validity of two of the precedents on which the plurality opinion relies. In both *Melvin* v. *Reid* (1931) 112 Cal.App. 285 [297 P. 91] and *Briscoe* v. *Reader's Digest Association, Inc.* (1971) 4 Cal.3d 529 [93 Cal.Rptr. 866, 483 P.2d 34, 57 A.L.R.3d 1], California courts permitted the plaintiffs to bring claims for the publication of the fact that, as shown in official public records, they had been tried for (and, in *Briscoe,* convicted of) crimes many years before. In *Briscoe,* this court reasoned that the crime and conviction no longer were newsworthy and therefore publication of those facts could be suppressed. I doubt that the holdings of these cases have survived the high court's holding in *Cox Broadcasting Corp.* v. *Cohn* (1975) 420 U.S. 469, 496 [95 S.Ct. 1029, 1047, 43 L.Ed.2d 328] that "the First and Fourteenth Amendments will not allow exposing the press to liability for truthfully publishing information released to the public in official court records," a prohibition that does not depend on the newsworthiness of the material published. (See also *Smith* v. *Daily Mail Publishing Co.* (1979) 443 U.S. 97, 103 [99 S.Ct. 2667, 2671, 61 L.Ed.2d 399] ["once the truthful information was 'publicly revealed' or 'in the public domain' the court could not constitutionally restrain its dissemination"].) Certainly, a widespread application of *Briscoe* could significantly alter the practice of biography and history, for even in the case of notable figures much of what occurs in their private lives may have faded from the public mind and, under the plurality opinion's test, may no longer be newsworthy by the time the biographer or historian arrives on the scene.

I do not doubt the need to protect individual privacy against the ever-increasing intrusions upon it. I do question whether the publication of private facts can be prohibited on the basis of the perceived newsworthiness of the facts without creating a conflict with current First Amendment doctrine. Others have also questioned whether this tort can be reconciled with the First Amendment. (*Hall* v. *Post* (1988) 323 N.C. 259, 267 [372 S.E.2d 711] [rejecting "constitutionally suspect" tort of publication of private facts because of its tension with the First Amendment]; Zimmerman, *Requiem for a*

*Heavyweight: A Farewell to Warren and Brandeis's Privacy Tort* (1983) 68 Cornell L.Rev. 291, 306, 365 [arguing against adoption of the tort].) In particular, the "newsworthiness" standard makes liability turn on the sort of content-based subjective value judgments that have long been anathema in the United States Supreme Court's First Amendment jurisprudence. It may be that someday that court will separate out private facts as a unique category of speech subject to special rules and a lesser degree of constitutional protection, as it has done for speech promoting commercial transactions. (See *Dun & Bradstreet, Inc.* v. *Greenmoss Builders* (1985) 472 U.S. 749, 758-760 [105 S.Ct. 2939, 2944-2946, 86 L.Ed.2d 593] (plur. opn. of Powell, J.) [characterizing speech on matters of private concern as subject to less stringent protection under the First Amendment than speech on public affairs].) Even in the commercial speech arena, however, the high court has rarely upheld restrictions suppressing truthful, nonmisleading statements. (See, e.g., *44 Liquormart* v. *Rhode Island* (1996) 517 U.S. 484 [116 S.Ct. 1495, 134 L.Ed.2d 711] [striking down ban on advertising the price of liquor].)

As in other areas requiring the reconciliation of strong but competing social interests, I would continue to mark the boundaries between the First Amendment and the "publication of private facts" tort by the method of case-by-case adjudication, as the United States Supreme Court has done. (The *Florida Star* v. *B. J. F., supra,* 491 U.S. 524, 530 [109 S.Ct. 2603, 2607] ["The tension between the right which the First Amendment accords to a free press, on the one hand, and the protections which various statutes and common-law doctrines accord to personal privacy against the publication of truthful information, on the other, is a subject we have addressed several times in recent years. . . . [A]lthough our decisions have without exception upheld the press' right to publish, we have emphasized each time that we were resolving this conflict only as it arose in a discrete factual context."]; *Cox Broadcasting Corp.* v. *Cohn, supra,* 420 U.S. 469.) Thus, I leave open the possibility that the plurality opinion's "newsworthiness" rule may require further adjustment and revision in the future when we are presented with a case in which its application, unlike the situation here, would affirm liability for the publication of truthful private facts.

Mosk, J., concurred.

**CHIN, J.,** Concurring and Dissenting.— ██ ██ ██ ██ ██ I concur in part I of the plurality opinion. The newsworthy nature of the disclosure absolutely precludes plaintiffs' recovery under this theory, and summary judgment for defendants on this cause of action was therefore proper.

I dissent, however, from the plurality's holding that plaintiffs' "intrusion" cause of action should be remanded for trial. The critical question is whether defendants' privacy intrusion was " '*highly* offensive to a reasonable person.' " (Plur. opn., *ante*, at p. 231, italics added.) As the plurality explains, "the constitutional protection of the press does reflect the strong societal interest in effective and complete reporting of events, an interest that may—as a matter of law—justify an intrusion that *would otherwise be considered offensive*." (*Id.* at p. 236, italics added.) I also agree with the plurality that "Information-collecting techniques that *may be highly offensive* when done for socially unprotected reasons—for purposes of harassment, blackmail or prurient curiosity, for example—*may not be offensive to a reasonable person* when employed by journalists in pursuit of a socially or politically important story." (*Id.* at p. 237, italics added.)

Although I agree with the plurality's premises, I disagree with the conclusion it draws from those premises. The plurality concludes that a reasonable person in Ruth Shulman's position might well have assumed that her conversation with the nurses and doctors assisting her rescue would be kept private. Likewise, the plurality believes, a reasonable person in Ruth's position might not expect to find media personnel aboard a rescue helicopter. A jury might well decide that defendants' desire for complete footage did not justify these privacy intrusions. (Plur. opn., *ante,* at pp. 237-238.)

Ruth's expectations notwithstanding, I do not believe that a reasonable trier of fact could find that defendants' conduct in this case was "highly offensive to a reasonable person," the test adopted by the plurality. Plaintiffs do not allege that defendants, though present at the accident rescue scene and in the helicopter, interfered with either the rescue or medical efforts, elicited embarrassing or offensive information from plaintiffs, or even tried to interrogate or interview them. Defendants' news team evidently merely recorded newsworthy events "of legitimate public concern" (plur. opn., *ante,* at p. 228) as they transpired. Defendants' apparent motive in undertaking the supposed privacy invasion was a reasonable and nonmalicious one: to obtain an accurate depiction of the rescue efforts from start to finish. The event was newsworthy, and the ultimate broadcast was both dramatic and educational, rather than tawdry or embarrassing.

No illegal trespass on private property occurred, and any technical illegality arising from defendants' recording Ruth's conversations with medical personnel was not so "highly offensive" as to justify liability. Recording the innocuous, inoffensive conversations that occurred between Ruth and the nurse assisting her (see plur. opn., *ante*, at p. 211) and filming the seemingly routine, though certainly newsworthy, helicopter ride (*id.* at pp. 211-212)

may have technically invaded plaintiffs' private "space," but in my view no "highly offensive" invasion of their privacy occurred.

We should bear in mind we are not dealing here with a true "interception"—e.g., a surreptitious wiretap by a third party—of words spoken in a truly private place—e.g., in a psychiatrist's examining room, an attorney's office, or a priest's confessional. Rather, here the broadcast showed Ruth speaking in settings where others could hear her, and the fact that she did not realize she was being recorded does not ipso facto transform defendants' newsgathering procedures into *highly* offensive conduct within the meaning of the law of intrusion.

In short, to turn a jury loose on the defendants in this case is itself "highly offensive" to me. I would reverse the judgment of the Court of Appeal with directions to affirm the summary judgment for defendants on all causes of action.

Mosk, J., concurred.

**BROWN, J.,** Concurring and Dissenting.— ▮▮▮▮▮ ▮▮▮ I concur in the plurality's conclusion that summary judgment should not have been granted as to the cause of action for intrusion, and I generally concur in its analysis of that cause of action.[1] I respectfully dissent, however, from the conclusion that summary judgment was proper as to plaintiff Ruth Shulman's cause of action for publication of private facts. For the reasons discussed below, I would hold that there are triable issues of material fact as to that cause of action as well.

Ironically, the plurality begins its discussion of the publication of private facts cause of action by describing it as "one of the more . . . well-defined areas of privacy law." (Plur. opn., *ante*, at p. 214.) While that may have been an accurate description before today's extended exegesis, it is certainly no longer the case. After paying lip service to this court's well-established, scholarly precedents, the plurality proceeds to ignore their test for assessing newsworthiness. Worse yet, the new test adopted in the plurality opinion

---

[1] I decline to join the plurality opinion's discussion of the intrusion cause of action in its entirety. As the plurality notes, "[t]he conduct of journalism does not depend, as a general matter, on the use of secret devices to record private conversations." (Plur. opn., *ante*, at p. 239.) Therefore, I do not share the view that "[e]quipment such as hidden cameras and miniature cordless and directional microphones are powerful investigative tools for newsgathering. . . ." (*Id.* at p. 237.) On a more fundamental level, I disagree with the artificial barrier the plurality erects between the publication of private facts and the intrusion causes of action. Unlike the plurality, for instance, I would hold that the depth of the intrusion into private affairs and the lawfulness of the news media's conduct are relevant to *both* causes of action.

seriously compromises personal privacy by rendering otherwise private facts newsworthy whenever they bear a "logical relationship" to a matter of legitimate public concern, even in situations where the news media obtain the private facts by deceptive and unlawful means.

The plurality opinion starts innocuously enough, correctly reciting the elements of a cause of action for publication of private facts: " '(1) public disclosure (2) of a private fact (3) which would be offensive and objectionable to the reasonable person and (4) which is not of legitimate public concern.' " (Plur. opn., *ante*, at p. 214, quoting *Diaz* v. *Oakland Tribune, Inc.* (1983) 139 Cal.App.3d 118, 126 [188 Cal.Rptr. 762].) The plurality opinion then recounts the general test we have consistently applied in determining whether the private fact disclosed is of legitimate public concern—that is, whether it is newsworthy: " 'In determining whether a particular incident is "newsworthy" and thus whether the privilege shields its truthful publication from liability, the courts consider a variety of factors, including the social value of the facts published, the depth of the article's intrusion into ostensibly private affairs, and the extent to which the party voluntarily acceded to a position of public notoriety.' " (Plur. opn., *ante*, at p. 220, quoting *Kapellas* v. *Kofman* (1969) 1 Cal.3d 20, 36 [81 Cal.Rptr. 360, 459 P.2d 912] (hereafter *Kapellas*); see also *Forsher* v. *Bugliosi* (1980) 26 Cal.3d 792, 810, 812 [163 Cal.Rptr. 628, 608 P.2d 716] [same]; *Briscoe* v. *Reader's Digest Association, Inc.* (1971) 4 Cal.3d 529, 541 [93 Cal.Rptr. 866, 483 P.2d 34, 57 A.L.R.3d 1] [same].)

In this case, a straightforward application of the *Kapellas* newsworthiness test leads to one inescapable conclusion—that, at the very least, there are triable issues of material fact on the question of newsworthiness. The private facts broadcast had little, if any, social value. (*Kapellas*, *supra*, 1 Cal.3d at p. 36.) The public has no legitimate interest in witnessing Ruth's disorientation and despair. Nor does it have any legitimate interest in knowing Ruth's personal and innermost thoughts immediately after sustaining injuries that rendered her a paraplegic and left her hospitalized for months—"I just want to die. I don't want to go through this." The depth of the broadcast's intrusion into ostensibly private affairs was substantial. (*Ibid.*) As the plurality later acknowledges in analyzing "the depth of the intrusion" for purposes of Ruth's intrusion cause of action, "[a]rguably, the last thing an injured accident victim should have to worry about while being pried from her wrecked car is that a television producer may be recording everything she says to medical personnel for the possible edification and entertainment of casual television viewers. [¶] For much the same reason, a jury could reasonably regard entering and riding in an ambulance—whether on the ground or in the air—with two seriously injured patients to be an egregious

intrusion on a place of expected seclusion. . . . A jury could reasonably believe that fundamental respect for human dignity requires the patients' anxious journey be taken only with those whose care is solely for them and out of sight of the prying eyes (or cameras) of others." (Plur. opn., *ante*, at p. 238.) There was nothing voluntary about Ruth's position of public notoriety. (*Kapellas, supra*, 1 Cal.3d at p. 36.) She was "involuntarily caught up in events of public interest" (plur. opn., *ante*, at p. 215), all the more so because defendants appear to have surreptitiously and unlawfully recorded her private conversations with Nurse Laura Carnahan. (See *id.* at pp. 233-235.)

Inexplicably, the plurality jettisons the *Kapellas* newsworthiness test in favor of its own "logical relationship" test. Under this new test, "where the facts disclosed about a private person involuntarily caught up in events of public interest bear a logical relationship to the newsworthy subject of the broadcast and are not intrusive in great disproportion to their relevance—the broadcast was of legitimate public concern, barring liability under the private facts tort." (Plur. opn., *ante*, at p. 215; see also *id.* at pp. 224-226, 228-229, 242.) Here, the plurality misapplies its own new test, wrongly concluding there are no triable issues of material fact. (Compare *id.* at pp. 228-230 [no triable issues] with *id.* at pp. 237-238 [describing the highly intrusive nature of the news media's conduct in this case].) More significantly, however, the plurality fails to acknowledge that its new test is a radical departure from that set out in *Kapellas* and its progeny, a departure that should be obvious to even a casual reader.

Under the plurality's new test, personal privacy must yield whenever the overall subject matter of a broadcast is newsworthy and the private facts disclosed bear a "logical relationship" to that subject matter. Thus, to "[t]he more difficult question [of] whether Ruth's appearance and words as she was extricated from the overturned car, placed in the helicopter and transported to the hospital were of legitimate public concern" (plur. opn., *ante*, at p. 228), the plurality offers the facile answer that they were because "her disorientation and despair were substantially relevant to the segment's newsworthy subject matter" (*id.* at p. 229).

Contrary to the plurality's claim that it is "*accommodating* conflicting interests in personal privacy and in press freedom as guaranteed by the First Amendment to the United States Constitution" (plur. opn., *ante*, at p. 215, italics added), in reality it sacrifices the constitutional right to privacy on the altar of the First Amendment. Unlike the *Kapellas* newsworthiness test, which expressly considers *both* "the depth of the [broadcast's] intrusion into ostensibly private affairs" *and* "the extent to which the party voluntarily acceded to a position of public notoriety" as part of the mix (*Kapellas, supra*,

1 Cal.3d at p. 36), the plurality's new "logical relationship" test considers *only* whether the private facts disclosed are "intrusive in great disproportion to their relevance" (plur. opn., *ante*, at p. 215).

The latter inquiry is substantially less accommodating of personal privacy than the former. Suppose, for example, that a television producer decided to broadcast a story on the reluctance of victims to report incidents of sexual assault, undeniably a newsworthy subject matter. Under the plurality's formulation, the producer would then be free to broadcast a surreptitiously and unlawfully recorded account of a specific victim's reluctance, conveyed in confidence to her therapist, because that too would undeniably bear "a logical relationship to the newsworthy subject of the broadcast" and would not be "intrusive *in great disproportion* to [its] relevance."[2] (Plur. opn., *ante*, at p. 215, italics added.) The *Kapellas* newsworthiness test, by contrast, would yield the correct result—namely, that the therapy session is not newsworthy because "the depth of the [broadcast's] intrusion into ostensibly private affairs" is simply too great and because the victim did not "voluntarily accede[] to a position of public notoriety." (*Kapellas, supra*, 1 Cal.3d at p. 36.)

In short, I see no reason to abandon our traditional newsworthiness test, which has produced consistent and predictable results over the course of nearly three decades. As I have explained, a straightforward application of that test demonstrates there are triable issues of material fact on the question of newsworthiness and, hence, that summary judgment should not have been granted on Ruth's cause of action for publication of private facts.

For the reasons discussed above, I would affirm the judgment of the Court of Appeal in its entirety.

Baxter, J., concurred.

Respondents' petition for a rehearing was denied July 29, 1998, and the opinion was modified to read as printed above. Mosk, J., and Chin, J., were of the opinion that the petition should be granted.

---

[2]Apparently recognizing the absurdity of precluding recovery under these circumstances, the plurality all but concedes that damages under an intrusion cause of action must include compensation for injury resulting *from the broadcast* of private facts gathered through intrusion. (Plur. opn., *ante*, at p. 240, fn. 18.) Likewise, the plurality conveniently sidesteps the significance of unlawful acquisition to a publication of private facts cause of action, "regarding it as going [only] to the extent of allowable damages for intrusion." (*Id.* at p. 230, fn. 11.) The only reasoning behind this ipse dixit—it is so because we say so. In reality, unlawful acquisition is clearly relevant to both "the depth of the [broadcast's] intrusion into ostensibly private affairs" and "the extent to which the party voluntarily acceded to a position of public notoriety" (*Kapellas, supra*, 1 Cal.3d at p. 36), two key factors in the traditional newsworthiness formulation.